Original
No. LD-2008-005

## CONNER'S CASE

Argued: January 9, 2009
Opinion Issued: January 29, 2009

*Landya B. McCafferty*, of Concord, on the brief and orally, for the professional conduct committee.

*William E. Conner*, on the memorandum of law and orally, *pro se*.

DUGGAN, J. On July 8, 2008, the Supreme Court Professional Conduct Committee (PCC) filed a petition recommending that the respondent, William E. Conner, be disbarred but that he be permitted to reapply for admission to the bar after three years, subject to his compliance with certain conditions. We order the respondent disbarred.

The respondent has stipulated to the underlying facts in this case and to his complicity therein. Accordingly, we accept the facts as alleged in the stipulation. In 1993, Michael and Elena Abbene of Bedford discovered alleged defects in their newly-constructed home and sought the assistance of Attorney Michael J. Scott in pursuing a potential recovery for those defects. Scott's suit on the Abbenes' behalf eventually ended with the enforcement of an arbitration award in September 2000. The award was not as favorable as the Abbenes had desired.

Despite their wish to avoid further litigation, by early 2001 Attorney David A. Young had convinced the Abbenes that he and the respondent could make them whole by pursuing new litigation. We note that Young has been disbarred for misconduct in an unrelated case. *See Young's Case*, 154 N.H. 359 (2006). The Abbenes paid Young and the respondent $7,500 to pursue new litigation relating to the construction of their home, as well as potential malpractice by Scott. Young also convinced the Abbenes to hire him and the respondent in relation to an unrelated personal injury case

they were pursuing, which eventually settled. A portion of the proceeds of that settlement were used to finance the Abbenes' home construction litigation.

In mid-2001, Young and the respondent initiated two actions on the Abbenes' behalf relating to the construction case. The first suit, which sought to challenge the arbitration award, was dismissed as untimely filed. In the second, Young and the respondent sued numerous entities alleged to be subcontractors in the construction of the Abbenes' home. Soon after filing, many of the defendants submitted motions to dismiss the action as barred by res judicata and the statute of limitations, as well as requests for attorney's fees. Young and the respondent essentially ignored these motions, filed no responses to them, and did not inform the Abbenes that they had been filed. In early 2002, the Trial Court (*Brennan*, J.) granted the first of the defendants' motions. Shortly thereafter, the respondent attempted, unsuccessfully, to vacate the trial court's orders. Even at this point, Young and the respondent had not informed the Abbenes of the dispositive motions, their failure to respond, or the trial court's decision to grant the first motions.

Following a March 2002 status conference, at which the respondent but neither Young nor the Abbenes appeared, Young and the respondent wrote a letter to the Abbenes informing them that the construction case might not be successful. In that letter, Young and the respondent referred to strategies and decisions which they claimed had been, but in fact were not, discussed with the Abbenes. Further, the letter did not inform the Abbenes that the case had already been effectively dismissed and that the trial court was preparing to award attorney's fees.

In April 2002, the respondent moved for a voluntary non-suit of the construction case. The trial court did not rule upon the motion, but scheduled a later hearing on the issue. Beginning in May 2002, the trial court issued a series of orders assessing attorney's fees against the Abbenes for a total of approximately $16,000. In a series of e-mail messages, Young and the respondent began discussing ways to pay the fee awards without informing the Abbenes in order to avoid claims of malpractice for filing, and then neglecting, meritless lawsuits. In July 2002, the trial court held the hearing on the motion for voluntary non-suit. Following the hearing the trial court held its decision on the motion in abeyance until Young and the respondent paid the assessed fees. Young and the respondent then exchanged further correspondence attempting to structure a method of paying the fees without informing the Abbenes about them. Eventually, the respondent informed the Abbenes that fees had been assessed, but did not disclose the amounts.

In December 2002, the trial court denied the motion for a voluntary non-suit, entered final judgment for the defendants and authorized the defendants to collect their fees from Young and the respondent, or from the Abbenes personally. Following this order, some of the defendants sought an order requiring the Abbenes to be served personally to appear before the court and show cause why they should not be required to pay the fees themselves. Prior to any service on the Abbenes, however, they had requested from the respondent a breakdown of the costs of the construction case, and the fees owed, as well as recommendations about how to pay the fees. They also wanted to know the reasons the fees had been assessed. The respondent was not forthcoming with much of the requested information.

In January 2003, the trial court granted the defendants' request to have the Abbenes served personally for a show cause hearing. Upon receiving the notice of the show cause hearing, the Abbenes decided to review the court's file themselves. Only then did the Abbenes learn the duration and extent of Young's and the respondent's neglect and malfeasance. In February 2003, the Abbenes fired the respondent and requested that he appear at the show cause hearing with their case files. Following this hearing, the trial judge recommended that the Abbenes hire independent counsel, and referred the respondent to the PCC. In early 2003, the Abbenes were ordered to pay the accrued attorney's fees personally. The Abbenes then filed formal complaints against Young and the respondent with the PCC.

Before the PCC, the respondent stipulated to the facts and the resulting violations of the New Hampshire Rules of Professional Conduct. Thus, the only issue was the sanction. The respondent stipulated to having violated: (1) Rule 1.1(a) for filing cases on the Abbenes' behalf knowing that they were without merit, and/or barred by law or the statute of limitations, as well as for failing to respond to dispositive motions or limit the Abbenes' losses; (2) Rule 1.3(a) for neglecting the construction case; (3) Rule 1.4(a)-(c) for failing to communicate with the Abbenes and inform them of the status of their cases and the mounting fees; (4) Rule 1.7(b) for operating under a conflict of interest when attempting to avoid a malpractice action at the expense of his duty of loyalty to the Abbenes; (5) Rule 8.4(c) for attempting to conceal information from the Abbenes and to deceive them about the status of their cases, as well as lying to them; and (6) Rule 8.4(a) for violations of the above-referenced rules.

The PCC's Hearing Panel recommended that the respondent be disbarred, but that he be permitted to apply for readmission "after an appropriate interval and with appropriate supervision." The PCC agreed that disbarment was the appropriate sanction, with the proviso that the respondent could apply for readmission after three years, so long as he was

an active participant in the New Hampshire Lawyers' Assistance Program. As the PCC seeks the sanction of disbarment, we review its recommendation, *see* SUP. CT. R. 37(16), keeping in mind that the sole issue before us is the proper sanction. The respondent, for his part, argues for a sanction only of a long-term suspension, subject to various conditions.

█ We retain the ultimate authority to determine the appropriate sanction for a violation of the rules governing attorney conduct. *Douglas' Case*, 156 N.H. 613, 621 (2007). When determining whether to impose the ultimate sanction of disbarment, we focus not on punishing the offender, but on protecting the public, maintaining public confidence in the bar, preserving the integrity of the legal profession, and preventing similar conduct in the future. *Id.* "In deciding the appropriate sanction, we consider the case on its own facts and circumstances." *Wolterbeek's Case*, 152 N.H. 710, 714 (2005).

█We look to the ABA STANDARDS FOR IMPOSING LAWYER SANCTIONS (1992) (STANDARDS) for guidance. *See Douglas' Case*, 156 N.H. at 621. Under the STANDARDS, we consider the following factors when imposing sanctions: "(a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors." *Id.*; STANDARDS, *supra* § 3.0. In applying these factors, the first step is to categorize the respondent's misconduct and identify the appropriate sanction. *Wolterbeek's Case*, 152 N.H. at 714. After determining the sanction, we consider the effect of any aggravating or mitigating factors on the ultimate sanction. *Id.* In the case of multiple charges of misconduct, the ABA recommends that the sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct among a number of violations; it might well be and generally should be greater than the sanction for the most serious misconduct. *Richmond's Case*, 152 N.H. 155, 160 (2005).

█ We review first the duties violated by the respondent. According to the PCC, the respondent's most severe violations were those of lying to his clients in violation of Rule 8.4(c), and of operating under a conflict of interest contrary to Rule 1.7(b). In so doing, the respondent violated his duties to be truthful and to act in the interests of his clients. We regard these as bedrock duties of the legal profession. While the respondent certainly violated other duties owed, *see, e.g.*, N.H. R. PROF. CONDUCT 1.1, 1.4, we, like the PCC, consider these to be the most serious. We note also that for *either* of these violations disbarment is generally the appropriate sanction. STANDARDS, *supra* §§ 4.31, 4.61.

■ Next, we review the respondent's mental state at the time of these violations. The respondent's mental state may be one of intent, knowledge, or negligence. *Grew's Case*, 156 N.H. 361, 366 (2007); STANDARDS, *supra* § 3.0 cmt. "What is relevant . . . is the volitional nature of the respondent's acts, and not the external pressures that could potentially have hindered his judgment." *Grew's Case*, 156 N.H. at 366. Given that the respondent's conduct of deceiving his clients and operating under a conflict of interest occurred over a period of at least a year, and involved collusion with Young to further the deception, we must conclude, as did the PCC, that the respondent acted intentionally and deliberately. *See Bosse's Case*, 155 N.H. 128, 131-32 (2007).

■ We next consider the actual or potential injury from the respondent's conduct. "The STANDARDS define 'injury' as 'harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct.' " *Id.* at 132 (brackets and quotations omitted). At a minimum, there was a substantial financial harm to the Abbenes, not only in that they were required to pay the significant attorney's fees levied, but also in the money lost paying for the services of the respondent to pursue essentially meritless lawsuits. In total, the respondent's actions cost the Abbenes more than $40,000, a consequential sum. Although the Abbenes have managed to recover some money through a malpractice action against Young, they have yet to recover approximately $12,000.

Reviewing these factors, we conclude, as did the PCC, that these violations indicate the appropriate baseline sanction to be disbarment. Indeed, it would be difficult to conclude that the sanction could be any other than disbarment given the lengthy and deliberate violation of ethical rules resulting in substantial financial harm to the Abbenes. Before deciding on the ultimate sanction, however, we must review any aggravating and mitigating factors. The PCC found as aggravating factors that the respondent: (1) acted with dishonesty to protect himself; (2) engaged in a pattern of conduct resulting in the commission of multiple offenses; and (3) has a prior disciplinary record, which included a public censure. *See* STANDARDS, *supra* § 9.22(a)-(d). We agree that these aggravating factors apply. We note that the prior censure resulted from events contemporaneous with, though unrelated to, those here.

Additionally, the PCC found what it refers to as "important" mitigating factors. These are that the respondent: (1) was facing a "series of personal problems" at the time of these events; (2) showed sincere remorse for his misconduct; (3) had suffered from depression and alcoholism; and (4) has taken steps toward rehabilitation in dealing with his substance abuse issues. *See* STANDARDS, *supra* § 9.32(c), (l). We also note that the respon-

dent has been thoroughly cooperative in the investigation and prosecution of the case against him. *See* STANDARDS, *supra* § 9.32(e).

■ After reviewing these factors we conclude, as did the PCC, that the proper sanction is disbarment. Although there are mitigating factors here, the respondent's deliberate deception of his clients over a substantial period can abide no less a sanction than disbarment. This sanction is in line with those imposed for similar misconduct. *See Bosse's Case*, 155 N.H. at 132-34 (collecting cases). We acknowledge, however, that the respondent's efforts to correct the personal problems that have plagued him may yet permit him to again practice law. Given that the purpose of imposing the sanction of disbarment is to protect the public, rather than to punish the offender, *see Coddington's Case*, 155 N.H. 66, 68 (2007), we believe that the respondent ought to be permitted the opportunity to reapply for admission after a meaningful term of disbarment. Thus, the respondent may apply for readmission after three years. Further, the respondent has stated that he voluntarily ceased his practice in New Hampshire in anticipation of a potential sanction in this case. We conclude that the three-year term ought to run from the date of this cessation. Accordingly, the respondent may apply for readmission no earlier than three years from July 1, 2008. We agree with the PCC that as a condition of his reapplication, the respondent shall be an active participant in the New Hampshire Lawyers' Assistance Program or an equivalent program approved and monitored by the New Hampshire Lawyers' Assistance Program. Finally, by the terms of the stipulation with the PCC, the respondent is ordered to reimburse the attorney discipline system for all expenses incurred in the investigation and enforcement of discipline in this case. SUP. CT. R. 37(19).

*So ordered.*

BRODERICK, C.J., and GALWAY, J., concurred.