Professional Conduct Committee
No. LD-2011-002

O'MEARA'S CASE

Argued: July 11, 2012
Opinion Issued: September 18, 2012

*Julie A. Introcaso*, disciplinary counsel, of Concord, on the brief, and *James L. Kruse*, assistant disciplinary counsel, of Concord, orally, for the professional conduct committee.

*Law Office of Joshua L. Gordon*, of Concord (*Joshua L. Gordon* on the brief and orally), for the respondent.

CONBOY, J. On February 14, 2011, the Supreme Court Professional Conduct Committee (PCC) filed a petition recommending that the respondent, Timothy O'Meara, be suspended from the practice of law for three years. We order him disbarred.

*I. Background*

*A. O'Meara's Conduct*

The following facts either were found by the PCC or are supported by the record. The conduct code violations at issue stem from O'Meara's representation of Anita and James Conant in a personal injury lawsuit. On May 19, 2005, Ms. Conant was involved in a car accident in Pennsylvania. She was stopped at a red light when her car was rear-ended by a paving truck driven by an employee of its owner, Lyons & Hohl Paving, Inc. She suffered a severe spinal cord injury and is now a ventilator-dependent quadriplegic. At the time of the accident, she was forty-seven years old. She and her husband lived in Hampton with their three adult children. Mr. Conant owned his own electrical business, and Ms. Conant was the postmaster in New Castle.

Immediately after the accident, Ms. Conant was intubated for respiratory failure and flown by helicopter to the hospital at the University of Pennsylvania, where she remained for twenty-three days in critical condition. While in Pennsylvania, she underwent several surgeries to stabilize her condition, including a cervical spinal fusion to insert steel rods into her spine, a tracheotomy to insert a permanent tracheal ventilator upon which she is dependent to breathe, and the installation of a feeding tube.

Mr. Conant flew home to New Hampshire five days after the accident. Before flying back to Pennsylvania on May 25, he met with O'Meara at a fast food restaurant near the airport to discuss the possibility of O'Meara representing the Conants in a personal injury lawsuit. As a result of the meeting, Mr. Conant retained O'Meara and signed a one-page contingent

fee agreement, which provided that O'Meara would be paid 33.33% of the "gross amount recovered" in the case, and that the Conants would be responsible for all expenses.

On or about June 3, approximately ten days after the Conants retained him, O'Meara learned that the paving company had insurance coverage totaling $11 million. The insurance company retained Robert S. Davis, of Philadelphia, Pennsylvania, to represent the paving company and its employee.

On November 3, 2005, O'Meara filed a personal injury lawsuit on behalf of the Conants in a Pennsylvania federal court. On December 1, 2005, Davis informed O'Meara that the insurer did not contest liability.

O'Meara sent Davis a letter dated December 8, 2005, stating, in pertinent part: "As I have indicated on numerous occasions previously, this is a policy limits case. If said limits are not paid, the Conant family has instructed me to proceed to trial." However, O'Meara was not authorized to settle the case for the insurance policy limits, and he sent the December 8 letter knowing that he lacked this authority.

On January 13, 2006, O'Meara and Davis discussed settlement. O'Meara told Davis that the Conants would release the paving company and its employee from liability in exchange for receiving the $11 million policy limits, less any advance payments. That day, O'Meara spoke with Mr. Conant who confirmed that O'Meara was *not* authorized to settle the case for $11 million, even if the insurer offered this amount. Between January 13 and January 24, O'Meara did not inform Davis that he lacked the authority to settle the case for $11 million or that, to the extent he ever had such authority, it had been revoked.

On January 24, O'Meara and Davis again discussed settlement. Davis agreed to settle the case for $11 million, but O'Meara told Davis that the Conants would not settle for this amount. Davis responded that he believed the parties had an enforceable settlement agreement because, on January 13, O'Meara had offered to settle for $11 million, and, on January 24, Davis had agreed to do so.

On January 24, Davis sent O'Meara a letter confirming his understanding of the parties' negotiations to date: "I write to confirm my telephone acceptance [today] . . . on behalf of the defendants and their insurer, of the plaintiffs' . . . offer to settle all aspects of this case for . . . $11,000,000. Subsequent to the above referenced acceptance of the plaintiffs' settlement offer you stated that the plaintiffs now withdraw the offer."

Also on January 24, O'Meara sent a letter to Davis, which he dated January 20, four days earlier, stating, in pertinent part: "As we discussed on the phone this morning, this correspondence should serve to inform you that my clients have withdrawn their settlement demand for the policy

limits of $11,000,000." Upon receipt of O'Meara's letter dated January 20, Davis wrote O'Meara a letter stating, "I trust that the date used on the [January 20] letter was simply the result of inadvertence."

In a subsequent discussion, Mr. Conant expressed dismay that O'Meara had stated in his January 24 letter (dated January 20) that the Conants "withdrew" their demand to settle the case for $11 million. Mr. Conant told O'Meara that he did not understand how the Conants could have withdrawn a settlement demand they had never made. O'Meara told Mr. Conant that Davis had simply misconstrued their conversations.

On or about January 25, 2006, O'Meara and two financial planners met with the Conants to discuss settlement. Mr. Conant expressed concern that O'Meara had communicated a demand to settle the case for $11 million even though he had no authority to do so and even though $11 million was insufficient to support Ms. Conant's future needs. On December 26, 2005, a certified life planner had opined that the total cost to sustain Ms. Conant for the rest of her life was over $15 million. The planner revised his estimate on January 26, 2006, to more than $23 million. Because O'Meara had erred by demanding to settle for $11 million, Mr. Conant suggested that he reduce his fee. O'Meara agreed to consider doing so and, ultimately, suggested reducing his fee by $166,000.

On January 31, the insurer filed a motion to enforce the alleged January 24 settlement agreement. O'Meara objected to the motion, arguing that his December 8 demand was not an "offer" to be "accepted" by the insurer, but rather a solicitation of an offer from the insurer, and that on January 24, the Conants had rejected the insurer's offer to settle the case for $11 million. O'Meara conceded that the Conants "had not authorized [him]" to settle the case for $11 million.

The dispute between the insurer and the Conants was scheduled for mediation in federal court on February 27, only days before Ms. Conant was scheduled for surgery that her family feared she would not survive. O'Meara met with Mr. Conant and the other members of the Conant family on February 25 to prepare for the mediation. At some point, Mr. Conant shared with O'Meara that the family believed that, to meet Ms. Conant's projected needs, $12.5 million needed to be placed in an annuity.

Mr. Conant asked O'Meara what he thought his fee should be in the event the case settled for the policy limits of $11 million. O'Meara said that he would be willing to reduce his $3.67 million potential fee by $500,000 if this occurred, angering Mr. Conant. Mr. Conant's brother, Craig, said that he had been informed that a $2 million fee was reasonable in a case such as this one. None of the other Conants responded to Craig's comment.

The exchange between O'Meara and the Conant family became heated, and at one point, Ms. Conant mouthed to O'Meara: "Tell me why I should

not fire you now?" When asked what would happen if the Conants fired him, O'Meara responded that litigation "gets ugly." He also told the Conants that if they terminated his services, he would sue them for his one-third contingency fee and "would win."

Ultimately, the Conants and O'Meara agreed to modify the original contingent fee agreement. As modified, instead of stating that O'Meara would be paid 33.33% of the gross recovery in the case, the agreement stated that his fee was "to be negotiated." Both Mr. Conant and O'Meara initialed this handwritten change to the original fee agreement.

The next day, February 26, O'Meara faxed Mr. Conant a "Memorandum of Understanding Regarding Fees," purporting to confirm the modified contingent fee agreement. However, instead of stating that O'Meara's fee was "to be negotiated," the memorandum stated: "If the final settlement offer is no more tha[n] $11,000,000 then the total of all attorneys fees and costs inclusive shall be no more than and no less than[] $2,000,000." Mr. Conant telephoned O'Meara that day and explained that he would not sign the memorandum because it did not reflect the parties' February 25 agreement.

On February 27, the day of the mediation, Mr. Conant and other members of his family met O'Meara at the federal courthouse in Pennsylvania. O'Meara said that he would not proceed with the mediation *unless* he received at least a $2 million fee. O'Meara gave Mr. Conant a new memorandum to sign, which stated: "The total of all attorneys fees and costs inclusive shall be no more than and no less than[] $2,000,000.00 for all settlements up to 14.5 m[illion] then 20% for all amounts recovered over 14,500,00[0]."

Mr. Conant believed that he had no choice but to sign the memorandum because he feared that if he did not do so, O'Meara would refuse to represent the family in the imminent mediation.

The mediation took place as scheduled. At the mediation, the mediator verified that if the paving company were forced to pay more than $500,000 over its insurance policy limits, it would likely declare bankruptcy. At the end of the mediation, the final offer from the paving company and its insurer was $11.5 million (the policy limits of $11 million plus $500,000). Unhappy with O'Meara's conduct, the Conants terminated his services effective March 5, 2006. On March 6, the parties settled the underlying personal injury action for $11.5 million.

The Conants and O'Meara agreed that the Conants would pay O'Meara an undisputed fee of $750,000, place $1,250,000 in escrow, and arbitrate the issue of how this amount should be divided. They also agreed that the Conants could not claim in the arbitration that O'Meara failed to obtain a reasonable result in their personal injury case.

During the arbitration, at which the Conants and O'Meara each had counsel, O'Meara testified that, before he left the Conants' home on February 25, the Conants had agreed to pay him $2 million in fees. Every other witness testified to the contrary, and the PCC found that O'Meara presented false testimony to induce the arbitrators into believing that the Conants had, in fact, agreed on February 25 to the essential terms of what later became the February 27 agreement. Ultimately, the arbitrator panel awarded O'Meara $837,000 of the $1,250,000 held in escrow and awarded the Conants the remaining $413,000.

## B. Disciplinary Proceedings

On April 1, 2009, the Attorney Disciplinary Office (ADO) issued a notice of charges to O'Meara, alleging that he had violated New Hampshire Rules of Professional Conduct 1.2(a) (Scope of Representation), 1.7 (Conflict of Interest), 8.4(c) (Deceit and Dishonesty), and 8.4(a) (General Rule). The charges were heard by the PCC's Hearing Panel in October and November 2009. The Panel found by clear and convincing evidence that O'Meara had committed the charged violations, and recommended disbarment.

In August 2010, the PCC agreed with the Hearing Panel about the rule violations. The PCC originally recommended that O'Meara be suspended from the practice of law for two years. However, disciplinary counsel moved for reconsideration, arguing for disbarment. The PCC granted the motion in part, finding that the correct baseline sanction for O'Meara's dishonest conduct was disbarment as set forth in Standard 5.11(b) of the ABA STANDARDS FOR IMPOSING LAWYER SANCTIONS (2005) (STANDARDS). However, the PCC found that disbarment was not the proper sanction because "the most serious charge [arose] from conduct that occurred after representation of the client was terminated in the context of a fee dispute." The PCC, therefore, recommended that O'Meara be suspended from the practice of law for three years.

## II. Analysis

In attorney discipline cases, we defer to the PCC's factual findings if supported by the record, but retain ultimate authority to determine whether, on the facts found, a violation of the rules governing attorney conduct has occurred and, if so, the sanction. *Bruzga's Case*, 162 N.H. 52, 57 (2011).

### A. Rules Violations

We first consider the PCC's finding by clear and convincing evidence that O'Meara violated the Rules. *See* SUP. CT. R. 37A(III)(d)(2)(C).

*1. Rule 1.2(a)*

Rule 1.2(a) states, in pertinent part: "[A] lawyer shall abide by a client's decisions concerning the objectives of representation, and . . . shall consult with the client as to the means by which they are to be pursued." N.H. R. PROF. CONDUCT 1.2(a). The PCC found that O'Meara violated Rule 1.2(a) because in his December 8, 2005 letter to, and January 13, 2006 conversation with, Davis, he communicated a demand to settle the personal injury case for $11 million even though the Conants had not authorized him to settle for this amount.

O'Meara first argues that the PCC mischaracterized the demand as a demand to settle when, in fact, it was a *"Dumas"* demand. *See Dumas v. State Farm Mut. Auto. Ins. Co.*, 111 N.H. 43 (1971). *Dumas* concerned an insured's action against a liability insurer for negligent failure to settle tort claims against the insured. *Dumas*, 111 N.H. at 44. Under *Dumas*, an insured may maintain such an action when the insured has an outstanding judgment against him for an amount in excess of the policy limits, and the case *could* have been settled within the policy limits. *See id.* at 44-45. In such a case, an insured tortfeasor may assign his *Dumas* claim against the insurer to the victim. *See id.* at 45. O'Meara contends that "all he did was make a *Dumas* demand . . . to invite an offer and set up the [insurer] for a failure to make one." Although O'Meara concedes that he had no authority to settle the case, he asserts that he had the authority to issue a so-called *Dumas* demand.

■ There is evidence in the record to support the PCC's finding by clear and convincing evidence that O'Meara communicated a settlement demand to the insurer's attorney, even though, as he concedes, he lacked the authority to do so. In his January 24 letter (dated January 20), O'Meara referred to his December 8 letter to Davis as a "settlement demand." The letter specifically stated that his clients "have withdrawn their settlement demand for the policy limits of $11,000,000." Moreover, Davis's February 3, 2006 letter to O'Meara supports a finding that O'Meara made a settlement demand. In his February letter, Davis stated: "On January 13, 2006, . . . [y]ou stated . . . that in exchange for payment of the policy limits of the [insurance] policies, less partial payments and the property damage payment already made, . . . the corporate defendant and its employee would be fully released." Davis confirmed the contents of his letter when he testified before the PCC. Because we conclude that there is evidence in the record to support the PCC's finding that O'Meara communicated a settlement demand, we uphold that finding. In light of our conclusion, we need not address whether O'Meara had the authority to issue a *"Dumas"* demand.

■ We reject O'Meara's assertion that his settlement demand was not an offer to settle. An "offer" is a promise to do or refrain from doing something provided that the offeree accepts the offer and pays or promises to pay the price of the offer. BLACK'S LAW DICTIONARY 1189 (9th ed. 2009). O'Meara's settlement demand *was* an offer: it was a promise by his clients to do something (release the defendants from liability) upon the promise of the insurer to pay the offer price ($11 million).

### 2. Rule 1.7

■ Rule 1.7(a)(2) provides, in pertinent part: "[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if . . . there is a significant risk that the representation of one or more clients will be materially limited . . . by a personal interest of the lawyer." The PCC found that O'Meara violated this Rule when: (1) he threatened to sue the Conants for his contingency fee if they terminated his services; (2) although the parties had agreed to revise the original contingent fee agreement by crossing out the reference to 33.33% and inserting "to be negotiated" in its place, O'Meara further revised the agreement without the Conants' knowledge or consent so that, as revised, it entitled him to a $2 million fee; and (3) O'Meara threatened to withdraw as counsel on the morning of the mediation so as to secure the $2 million fee. The PCC determined that by engaging in this conduct, O'Meara let his own personal interest in collecting a $2 million fee materially limit his representation of, and duty of loyalty to, the Conants.

■ The testimony and written statements of the Conants support these findings by clear and convincing evidence. Although O'Meara's testimony conflicted with that of the Conants, "[a]s a fact-finding tribunal, the [PCC] was at liberty to resolve any conflict in the evidence and to accept or reject such portions of the testimony as it saw fit." *Appeal of Alexander*, 163 N.H. 397, 403-04 (2012) (quotation omitted) (referring to personnel appeals board); *see Budnitz' Case*, 139 N.H. 489, 491 (1995).

O'Meara asserts that, in fact, his interests and those of the Conants were aligned. However, there is ample evidence to support the PCC's finding that O'Meara allowed his interest in securing a $2 million fee to take precedence over his primary obligation to further the Conants' interests.

### 3. Rule 8.4(c)

■ Rule 8.4(c) states, in pertinent part: "It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation." The PCC found that O'Meara violated this rule by falsely testifying at the arbitration hearing that the Conants agreed to his

$2 million fee at the February 25 meeting. The PCC reached this conclusion based upon its finding that every other witness contradicted O'Meara's account of the February 25 meeting. The PCC speculated, as well, that the arbitration panel likely concluded that O'Meara testified falsely about the February 25 meeting because it awarded him a total fee of $1,587,000, instead of the $2 million fee to which he claimed he was entitled.

O'Meara does not dispute that he was the only witness to testify that the parties agreed to his $2 million fee at the February 25 meeting. Nor does he dispute that the arbitration panel did not award him his entire $2 million fee. To the extent that O'Meara contends that the arbitration panel, in fact, found his testimony to be credible, we lack a sufficient record to decide this issue because the panel's decision was not part of the PCC record and is not part of the record on appeal. Because there is evidence in the record that supports the PCC's finding by clear and convincing evidence, we uphold it.

### 4. Rule 8.4(a)

Rule 8.4(a) provides that it is "professional misconduct for a lawyer to violate or attempt to violate the Rules of Professional Conduct." Because we have upheld the PCC's determination that O'Meara violated several Rules, we necessarily also uphold its conclusion that he violated Rule 8.4(a).

### B. Sanction

Having concluded that O'Meara violated the Rules, we turn next to the sanction. We retain the ultimate authority to determine the sanction for a violation of the Rules. *Bruzga's Case*, 162 N.H. at 60. When determining whether to impose the ultimate sanction of disbarment, we focus not on punishing the offender, but on protecting the public, maintaining public confidence in the bar, preserving the integrity of the legal profession, and preventing similar conduct in the future. *Morse's Case*, 160 N.H. 538, 546 (2010). We consider the case on its own facts and circumstances in deciding the sanction. *Id.* The sanction we impose must take into account the severity of the misconduct. *Id.*

We look to the STANDARDS for guidance. *Id.* at 547. Under the STANDARDS, we consider: (a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors. *Id.* We first categorize the respondent's misconduct and identify the baseline sanction. *Id.* After determining the sanction, we then consider the effect of any aggravating or mitigating factors on the ultimate sanction. *Id.* When there are multiple misconduct charges, "the sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct

among a number of violations; it might well be and generally should be greater than the sanction for the most serious misconduct." *Id.* (quotation omitted).

■ We first review the duties O'Meara violated. *See id.* According to the PCC, O'Meara's most serious violation was lying to the arbitration panel, in violation of Rule 8.4(c). Equally serious, in our view, is O'Meara's violation of Rule 1.7(a)(2) by allowing his own interests to interfere with effective representation of the Conants under the circumstances, and, ultimately, by threatening to withdraw from representation on the morning of the mediation unless they acceded to his demand for a $2 million fee. O'Meara's conduct violated his duties to be truthful and to act in his clients' best interests. *Conner's Case*, 158 N.H. 299, 303 (2009). "We regard these as bedrock duties of the legal profession." *Id.*

■ Next, we consider O'Meara's mental state at the time of his violations, which may be one of intent, knowledge, or negligence. *Id.* at 304. The volitional nature of the acts, and not the external pressures that could potentially have hindered his judgment, is relevant. *Id.* The PCC determined that O'Meara acted knowingly, and we agree. *See Wyatt's Case*, 159 N.H. 285, 307 (2009).

■ Next, we consider the actual or potential injury caused by O'Meara's misconduct. "The STANDARDS define 'injury' as harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct." *Conner's Case*, 158 N.H. at 304 (quotation omitted). Aside from the costs incurred by the Conants for the lengthy fee dispute arbitration, the paramount injury here is injury to the profession. "[I]njury to the integrity of the legal profession is substantial whenever an attorney engages in deceit." *Bosse's Case*, 155 N.H. 128, 132 (2007).

■ Considering the duties violated, O'Meara's mental state, and the harm and potential harm caused, we conclude, as did the PCC, that the proper baseline sanction is disbarment. "Disbarment is generally appropriate when a lawyer, without the informed consent of client(s) . . . engages in representation of a client knowing that the lawyer's interests are adverse to the client's with the intent to benefit the lawyer . . . , and causes serious or potentially serious injury to the client." STANDARDS, *supra* § 4.31(a). Here, O'Meara knowingly allowed his representation of the Conants to be materially limited by his own interest in obtaining a lucrative fee. On the morning of the mediation, just days before Ms. Conant was scheduled for life-threatening surgery, he gave the Conants an ultimatum: either agree to a $2 million fee or represent themselves in the mediation. This egregious conduct was improper. *See* N.H. R. PROF. CONDUCT 1.16(b) (attorney may

withdraw from representation only when "withdrawal can be accomplished without material adverse effect on the interests of the client").

Disbarment is also generally proper "when . . . a lawyer engages in . . . intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice." STANDARDS, *supra* at § 5.11(b). "The privilege of practicing law" comes with "the concomitant responsibility of truth, candor and honesty. Because no single transgression reflects more negatively on the legal profession than a lie," attorney misconduct involving dishonesty usually justifies disbarment. *Cohen's Case*, 143 N.H. 169, 172 (1998) (quotations, brackets, and ellipsis omitted). Here, O'Meara lied under oath when he testified at the arbitration that the Conants agreed to his $2 million fee at the February 25 meeting. Although O'Meara cannot be faulted for vigorously advocating his position in the arbitration, vigorous advocacy cannot include lying to a tribunal.

We next consider the effect of aggravating and mitigating factors. There are no substantial mitigating factors in this case. The PCC found that the only possible mitigating factor was the delay in proceedings. Like the PCC, we give this factor little weight. *See Douglas' Case*, 156 N.H. 613, 621-22 (2007) (delay generally not considered a mitigating factor). By contrast, there are numerous aggravating factors: (1) O'Meara's prior disciplinary offense for engaging in similar misconduct — lying to a tribunal, *see O'Meara's Case*, 150 N.H. 157, 159 (2003); (2) his selfish motive; (3) his failure to acknowledge any wrongdoing; (4) his substantial experience in the practice of law; and (5) his multiple Rule violations.

Despite the presence of numerous aggravating factors and the lack of mitigating factors, and even though it recognized that disbarment was the baseline sanction, the PCC recommended suspension because, when O'Meara lied to the arbitration panel, he was no longer the Conants' attorney and he lied in the context of a fee dispute. We disagree with this reasoning. Even though O'Meara no longer represented the Conants when he lied to the arbitration panel, his conduct adversely reflects upon his fitness to practice law. *See Bosse's Case*, 155 N.H. at 131. "Lawyering involves a public trust and requires an unswerving allegiance to honesty and integrity." *Id.* (quotation omitted). "Accordingly, it is the responsibility of every attorney at all times to be truthful." *Id.* (quotation omitted). "As officers of the court, attorneys are prohibited from making false statements of material fact to a tribunal." *Morse's Case*, 160 N.H. at 548; *see* N.H. R. PROF. CONDUCT, 3.3(a)(1). O'Meara's false testimony demonstrated a "serious disregard" for the very institutions that he has sworn to protect

and uphold. *Fitzpatrick's Case*, 132 N.H. 211, 217 (1989). We have previously disbarred attorneys for engaging in similar misconduct. *See id.* at 218 (disbarring attorney for lying to PCC); *Budnitz' Case*, 139 N.H. at 492-93 (disbarring attorney for lying to grand jury and PCC); *cf. Astles' Case*, 134 N.H. 602, 605-07 (1991) (disbarring attorney for using dishonest and fraudulent means to obtain commercial financing for his own home).

That O'Meara lied in the context of a fee dispute illustrates that the purpose of his lie was to further his own interest, at the expense of his clients' interests. If anything, this is an aggravating, not a mitigating, factor. Moreover, O'Meara did more than just lie to the arbitration panel. He demanded to settle his clients' case for $11 million without any authority to do so. Most significantly, he pressured his clients into agreeing to pay him a $2 million fee because, as the PCC found, he "did not want a significant fee to slip away."

In light of the egregiousness of O'Meara's misconduct, the absence of mitigating factors, and the presence of numerous aggravating factors, we conclude that disbarment is the proper sanction. Disbarment is necessary to protect the public and preserve the integrity of the legal profession when, as in this case, an attorney not only selfishly allows his own personal interests to take precedence over his duty of loyalty to his clients, but also lies to a tribunal. No lesser sanction will suffice.

O'Meara is hereby assessed all expenses incurred by the PCC in the investigation and prosecution of this matter. In the event that O'Meara applies to be readmitted to the bar, he may not do so earlier than three years from the date of this opinion. *See* SUP. CT. R. 37A (I)(c). Under no circumstances shall he be readmitted to the bar unless he passes the New Hampshire Bar Examination and the Multistate Professional Responsibility Examination and satisfies the other requirements of Supreme Court Rule 37(14).

*So ordered.*

DALIANIS, C.J., and HICKS and LYNN, JJ., concurred.