NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports.  Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Original
No. LD-2018-0007

SALOMON'S CASE

Argued:  November 27, 2018
Opinion Issued:  January 23, 2019

Elizabeth M. Murphy, assistant disciplinary counsel, on the brief and orally, for the attorney discipline office.

Upton & Hatfield, LLP, of Portsmouth (Russell F. Hilliard on the brief and orally), for the respondent.

DONOVAN, J.  On June 5, 2018, the Supreme Court Professional Conduct Committee (PCC) filed a petition recommending that the respondent, Craig N. Salomon, be disbarred.  We order the respondent disbarred.

I. Background

A. Haase Matter

The PCC found the following facts.  The Attorney Discipline Office (ADO) received two unrelated complaints regarding the respondent.  The first complaint (hereinafter, the Haase matter) led to an investigation of the respondent's representation of Deborah Fogg during and after her divorce from George Fogg. The divorce was finalized in 2009 and the final divorce agreement included, inter alia, the following: (1) Ms. Fogg would obtain possession of the marital property in Seabrook (the Fogg property); (2) she agreed that she owed Mr. Fogg $22,350; (3) she would convey a first mortgage to Mr. Fogg for that amount; and (4) the

$22,350 was payable within eighteen months. Ms. Fogg planned to sell the property and use the proceeds to pay Mr. Fogg. At the time the divorce was finalized, Ms. Fogg also owed the respondent $12,000 in attorney's fees and granted the respondent a second mortgage on the Fogg property in the amount of $12,000 to guarantee the payment. Both of these mortgages were recorded.

Following the divorce, the respondent continued to provide assistance to Ms. Fogg by helping her to find a buyer or a developer to purchase the Fogg property. The respondent never billed Ms. Fogg for his efforts relating to the Fogg property, nor is there evidence that the respondent asked Ms. Fogg to execute a fee agreement for his services in this regard. The respondent testified that he had intended to put a future advances clause in the $12,000 mortgage instrument as security for future legal fees, but had forgotten to do so.

After the divorce was finalized, the respondent contacted a friend and client, Dale Wood, to advise him of the settlement. The respondent persuaded Wood's company, Pan American Fund, LLC, to accept an assignment of the second mortgage in exchange for a payment from Pan American Fund to the respondent. The respondent used information obtained through his representation of Ms. Fogg, including appraisals and other non-public information the respondent obtained during his representation, to negotiate the assignment of the second mortgage and, thus, to obtain his attorney's fees prior to the sale of the Fogg property.

Shortly thereafter, the respondent sought a $22,350 advance from Pan American Fund. He testified that he planned to use the money to purchase the mortgage issued to Mr. Fogg. He then planned to have Ms. Fogg execute a mortgage to the respondent in the amount of $22,350, and he intended to assign that second mortgage to Pan American Fund, so that Pan American Fund could be in the first position to foreclose on the property if Ms. Fogg was unable to sell it or otherwise failed to fulfill her obligations.

The respondent's file included a proposed assignment of the $22,350 mortgage from Ms. Fogg to the respondent. The third page of the document contained a signature that appeared to be Ms. Fogg's, but was never dated, witnessed, or recorded and Ms. Fogg testified that she did not recall signing the document nor did she recall being apprised of the respondent's plan to buy out her ex-husband's mortgage.

Pan American Fund advanced the respondent the full $22,350 to buy out the mortgage even though the respondent testified that it was never his intention to offer the full-face amount of the mortgage to Mr. Fogg. When asked what the parties intended with respect to any money earned by a discounted buy-out of Mr. Fogg, the respondent testified that he did not know. The respondent then offered to buy out Mr. Fogg for less than the full value of the mortgage. Mr. Fogg declined to accept the offer.

2

Thereafter, the respondent negotiated with Wood to turn the $22,350 into a personal loan, creating an obligation in that amount plus interest to Pan American Fund. The record reflects that when the respondent signed the promissory note, he identified the Fogg property as security for the loan of $22,350.

Subsequently, Pan American Fund assigned to Irving Haase/Heirs, LLC both the $12,000 mortgage and the respondent's $22,350 loan. Haase believed that those amounts were secured by mortgages filed against the Fogg property. In 2013, Haase contacted the respondent to have him initiate the process of collecting on the notes, which were past due. Unbeknownst to Haase or the respondent, Ms. Fogg had quitclaimed the deed to her property to Mr. Fogg to satisfy her debt to him.

The respondent represented Haase/Heirs, LLC in foreclosure proceedings against the Fogg property which was now owned by Mr. Fogg. In November 2013, the respondent sent a letter to Mr. Fogg demanding payment of principal and interest in the amount of $47,891.13. Mr. Fogg notified the respondent that he contested the amount and requested documentation supporting the demand. The respondent did not provide documentation. Formal foreclosure proceedings were initiated in December 2013.

Mr. Fogg retained an attorney who communicated with the respondent. A settlement agreement was ultimately reached that recognized that the only mortgage eligible for foreclosure was the second mortgage for $12,000 that the respondent had assigned to Pan American Fund.

### B. Florida Matter

The second unrelated complaint against the respondent was received by the ADO in October 2014 from an attorney at a law firm in Florida who filed on behalf of HPC U.S. Fund 1, L.P. and HPC U.S. Fund 2, L.P. and its authorized representative, Mr. Brinke. This matter involves the respondent's representation of Blackport Investment Group, LLC, which was created and retained by HPC U.S. Fund 1, L.P. and HPC U.S. Fund 2, L.P. The HPC entities are holding companies of German-based investment vehicles that hold real estate interests throughout the United States. Blackport managed these interests for HPC.

Wood was Blackport's asset manager representative. The respondent previously represented Wood individually and has represented companies, including Blackport, of which Wood was an owner, member, or manager. Wood and the respondent had a lengthy personal and professional relationship.

HPC initiated proceedings in the United States District Court for the Southern District of Florida concerning Wood's mismanagement of HPC's

3

funds, and alleged that Wood had misappropriated approximately $10,000,000. The federal court issued a temporary restraining order followed by a preliminary injunction, entered on September 4, 2013, against a number of defendants, including Wood. The preliminary injunction prohibited Wood or "any and all persons acting under Defendant's direction or control" from taking any action with respect to any property interests held by HPC. The prohibition included transferring or secreting any property interests or liquid assets they held as a result of the transfer, sale, or conveyance of HPC's property interests.

During this time frame, the respondent began to represent Blackport in the sale of property in Idaho, which was largely owned by HPC. The respondent contacted North Idaho Title, the company that was handling the purchase and sale of the Idaho property, and conducted some preliminary work on behalf of Blackport. Wood was one of the respondent's contacts for Blackport. However, as the parties moved towards a possible closing date, Wood informed the respondent via e-mail about the injunction issued by the federal court, which prohibited Wood from having any involvement in the conveyance of any property interests of HPC. In fact, Wood explicitly informed the respondent that, because of the injunction, Wood was not authorized to sign on behalf of Blackport for the sale of the property.

Thereafter, the closing was dependent on determining who was authorized to sign on behalf of the seller. Despite his knowledge of the injunction, the respondent informed North Idaho Title that Wood could sign on behalf of Blackport, and the transaction closed in November 2013. The respondent testified that he advised North Idaho Title that Wood had authority because Wood had told him that Wood's lawyer advised Wood to sign on behalf of Blackport, to protect the minority owner's interest in the property.

Following the sale of the property, the proceeds were deposited in the respondent's escrow account. The respondent did not notify HPC or its counsel that he was holding funds governed by the preliminary injunction. Instead, the respondent disbursed those funds at the direction of Wood, including the payment of the respondent's attorney's fees. Approximately two weeks after the disbursement, $51,970 was returned to the respondent's trust account and disbursed to a different entity under the direction of Wood. Wood authorized the respondent to keep an additional $3,000 in attorney's fees.

In January 2014, HPC, through their attorneys, discovered that the property in Idaho had been conveyed without their knowledge. HPC initiated contempt proceedings in federal court against Wood. The proceedings were ultimately broadened to include a third-party contemnor claim against the respondent, who received notice and appeared before the court on one occasion. The matter was continued, and the respondent did not subsequently appear at any further proceedings.

4

The federal court found that the respondent had violated the preliminary injunction. In a September 2014 order, the magistrate found that Wood and the respondent "were aware of the injunction and had the ability to comply with it, but chose not to do so." After the federal court adopted the magistrate's report, HPC filed a motion for judgment and an award of attorney's fees. The respondent filed an objection. In June 2015, the court ordered that Wood and the respondent were jointly and severally liable to HPC for $301,874.70 in contempt damages, $135,739.50 in attorney's fees, and $4,672.70 in costs.

After receiving these two complaints — regarding the Haase and Florida matters — the ADO requested that the chair of the hearing committee appoint a hearing panel. See Sup. Ct. R. 37A(III)(b)(4). Following a hearing, the panel found that the respondent violated numerous rules of the New Hampshire Rules of Professional Conduct in both matters. The PCC agreed with the hearing panel and recommended that the respondent be disbarred.

II. Analysis

The respondent argues that there is insufficient evidence to support a finding by clear and convincing evidence that he violated the Rules of Professional Conduct in either matter. Furthermore, the respondent contends that if we agree with the PCC that he violated several Rules, we should impose an alternative sanction to disbarment, which would allow the respondent to continue practicing law at a private law firm with oversight with an agreement to retire from the practice of law in 2020.

In attorney discipline cases, we defer to the PCC's factual findings if supported by the record, but retain ultimate authority to determine whether, on the facts found, a violation of the rules governing attorney conduct has occurred and, if so, the sanction. O'Meara's Case, 164 N.H. 170, 176 (2012). We first consider whether there is sufficient evidence in the record to support the PCC's findings by clear and convincing evidence that the respondent violated the Rules. Sup. Ct. R. 37A(III)(d)(2)(C).

A. Rules Violations: Haase Matter

Regarding the Haase matter, the PCC found that the respondent violated Rules 1.7, 3.1, 4.1, and 8.4.

As an initial matter, the respondent justifies his actions relating to nearly all of the rule violations in this matter on the basis that, during the time of the alleged misconduct, he mistakenly believed that the $12,000 mortgage on the Fogg property had a future advances clause that entitled him to the amount equal to that secured by both mortgages on the property. He acknowledges that the mortgage had no future advances clause, but nonetheless claims that the $12,000 mortgage on the property was supposed to include a future

advances clause, which he contends would have obligated Ms. Fogg to pay up to $22,350 for legal services he allegedly provided researching the sale and potential development of the property. The respondent implicitly maintains that this mistaken belief explains why he signed a promissory note and listed the Fogg property as the security for the loan of $22,350 by Pan American Fund. The PCC did not find the respondent's explanation credible.

Ms. Fogg testified that she did not agree to a mortgage for more than $12,000. The evidence presented to the PCC supports her testimony because there is no evidence that the respondent invoiced Ms. Fogg for his post-divorce work relating to the property and there is no written fee agreement defining the terms of the respondent's representation. Although the respondent's testimony conflicted with the other evidence presented, "as a fact-finding tribunal, the PCC was at liberty to resolve any conflict in the evidence and to accept or reject such portions of the testimony as it saw fit." O'Meara, 164 N.H. at 178 (quotation and brackets omitted). We defer to the PCC's finding that the respondent's testimony was not credible and we agree that the record does not support the respondent's assertion that he believed that the $12,000 mortgage included a future advances clause.

### 1. Rule 1.7

Rule 1.7 provides, in relevant part, that:

[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

> (1) the representation of one client will be directly adverse to another client; or

> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

The PCC found that the respondent violated this rule when he represented both Ms. Fogg, who had an interest to sell the marital property, and Pan American Fund, an entity interested in purchasing the property. The evidence supporting this finding is clear and convincing. The respondent contends that there was no conflict because his clients had parallel interests. We disagree. Based upon the record, we agree with the PCC's inference that Ms. Fogg wanted to sell her property at a maximum value — she had to pay Mr. Fogg within eighteen months and would have wanted to retain any excess proceeds earned by the sale. In contrast, Pan American Fund was considering purchasing the property, and the PCC reasonably inferred that it would seek

6

the lowest possible purchase price. Thus, the interests of Ms. Fogg and Pan American Fund were in conflict. See Boyle's Case, 136 N.H. 21, 24 (1992) (finding a violation of Rule 1.7 where a fundamental conflict existed between the respondent's role as guardian ad litem for the children and his role as advocate for their father in a criminal matter). The respondent's representation of his clients was also limited by his personal interest to obtain the $22,350 amount he purportedly believed he had earned. Thus, there is ample evidence in the record that supports the PCC's finding by clear and convincing evidence that the respondent violated Rule 1.7.

### 2. Rule 3.1

Rule 3.1 provides that "[a] lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law."

The record supports the PCC's finding by clear and convincing evidence that, when the respondent brought the foreclosure action against Mr. Fogg demanding a sum of money, he knew that he had no legal or factual basis to do so. The respondent initiated a foreclosure action against Mr. Fogg demanding $47,891.13. The respondent testified that he did not conduct a title search of the property or review the mortgage he received from Ms. Fogg prior to executing the foreclosure notice. When Mr. Fogg inquired further about the basis for the foreclosure demand, the respondent did not provide any documentation. Mr. Fogg retained an attorney who communicated with the respondent. The respondent testified that at some point he realized that there was no future advances clause and that the only mortgage eligible for foreclosure was the $12,000 second mortgage. The respondent claims that because he understood the $12,000 mortgage to include a future advances clause, he had a "good faith" basis for initiating the foreclosure proceeding. As discussed above, the PCC was at liberty to resolve any conflict in the evidence and we defer to its finding that the respondent has not demonstrated that, an attorney with forty years of experience, forgot to include a future advances clause and misunderstood the state of the various loans and mortgages held on the property. See O'Meara, 164 N.H. at 178.

The respondent knew that neither he nor Pan American Fund held the $22,350 mortgage on the Fogg property. He had failed to purchase Mr. Fogg's interest in the property and his reliance on an unwritten future advances clause was unreasonable. Thus, the evidence in the record supports the PCC's finding by clear and convincing evidence that the respondent's initiation of foreclosure proceedings against Mr. Fogg, demanding an excessive payoff, with no foundation, was in violation of Rule 3.1.

### 3. Rule 4.1

Similarly, there is clear and convincing evidence in the record to support the PCC's finding that the respondent violated Rule 4.1, which provides that:

In the course of representing a client a lawyer shall not knowingly:

> (a) make a false statement of material fact or law to a third person; or

> (b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6.

The respondent knowingly sent a demand letter, followed by a foreclosure notice, to Mr. Fogg demanding $47,891.13 when he knew that he had borrowed $22,350 from Pan American Fund, signed a promissory note for that amount plus interest, and had no mortgage on the property securing any debt relating to the $22,350 loan. The only debt that the Fogg property secured was the $12,000 mortgage the respondent had assigned to Pan American Fund. The PCC was not persuaded by the respondent's claim that he believed that the mortgage he drafted included a future advances clause, and that is why he accepted the advance from Pan American Fund. His representations to Haase that such a mortgage existed and his representations to Mr. Fogg in issuing the $47,891.13 foreclosure demand were false statements of material fact. Thus, the evidence in the record supports the PCC's determination that the respondent violated Rule 4.1.

### 4. Rule 8.4

Rule 8.4(a) provides that it is professional misconduct for a lawyer to "violate or attempt to violate the Rules of Professional Conduct." Rule 8.4(c) further provides that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." Because we have concluded that the evidence in the record supports the PCC's determination that the respondent violated several Rules, including Rule 4.1 involving false statements, we necessarily also conclude that there is clear and convincing evidence in the record to support its ruling that he violated Rule 8.4.

### B. Rules Violations: Florida Matter

As to the Florida matter, the PCC found that the respondent violated Rules 1.2, 1.4, 1.15, 3.4, 8.4(a), and 8.4(c).

All of these rule violations stem from the fact that the federal court in Florida issued an injunction prohibiting Wood or "any and all persons acting under Defendant's direction or control" from taking any action regarding HPC's property interests, and that, despite knowing about the court order, the respondent facilitated the sale of property in Idaho and distributed the sale proceeds at the direction of Wood. The respondent asserts that during and after the sale he proceeded in accordance with instructions he received from Blackport and, therefore, he did not believe he was violating the court order. Specifically, he contends that even though he knew about the injunction, he was uncertain whether Wood had been removed as manager of Blackport and whether Blackport was part of the preliminary injunction. He further asserts that he was not aware of an attempt to remove Blackport as the manager of HPC.

### 1. Rule 1.2

Rule 1.2(d) provides that "[a] lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent . . . ." Despite Wood's reminders to the respondent that he could not perform certain actions in light of the federal court's injunction, the respondent ultimately assisted Wood to violate the court's order. The respondent testified that Wood represented to the respondent that Wood had received legal advice that he could sign on behalf of Blackport in the sale of the Idaho property. However, the respondent testified that he did not attempt to contact Wood's counsel about this matter. The PCC found the respondent's alleged reliance on Wood's representation unreasonable. We agree. Thus, when Wood signed on behalf of Blackport, after the respondent had been informed of the injunction, the respondent assisted Wood to engage in fraudulent conduct by knowingly violating the federal court injunction.[1] Therefore, clear and convincing evidence in the record supports the PCC's determination that the respondent violated Rule 1.2.

### 2. Rule 1.4

The record further supports the PCC's finding by clear and convincing evidence that the respondent also violated Rule 1.4, which provides that a lawyer shall "consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional Conduct or other law." N.H. R. Prof. Conduct 1.4(a)(5). Notwithstanding the respondent's knowledge of the

---

[1] The respondent argues that he could not afford to defend against the contempt proceedings in Florida and, therefore, a judgment was entered against him without any hearing on the merits at which he appeared. The respondent further contends that the contempt order issued in the federal court is not binding on this court. Because we conclude that there is evidence in the record to support a finding that the respondent violated the injunction, we need not base our decision solely on the fact that a contempt order was issued.

injunction, he did not consult with Wood or others who worked for Blackport about any relevant limitation that the injunction could have on his conduct. The PCC was not persuaded by the respondent's argument that he relied on other people from Blackport, or other unidentified attorneys advising Wood, when moving forward with the Idaho transaction and therefore he did not violate Rule 1.4 with respect to his communication with Blackport. We conclude that the evidence in the record supports the PCC's ruling that the injunction limited the respondent's conduct, and by not consulting with his client, or any of its representatives, about how the injunction impacted his assistance and prohibited certain actions, he violated Rule 1.4.

### 3. Rule 1.15

The record also supports the PCC's finding by clear and convincing evidence that the respondent violated Rule 1.15. Rule 1.15(e) provides that "[u]pon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person." Rule 1.15(f) provides that "[w]hen in the course of representation a lawyer is in possession of property in which two or more persons (one of whom may be the lawyer) claim interests, the property shall be kept separate by the lawyer until the dispute is resolved."

HPC held title to the Idaho property and was therefore entitled to the proceeds of its sale. When the respondent received funds from the sale of the Idaho property, in which he knew that HPC held an interest, he neither notified HPC or its attorneys upon receipt of those funds, nor did he keep the proceeds of the sale in his escrow account until it was determined who was entitled to the funds. Instead, he disbursed the funds at Wood's direction, while the respondent knew that Wood was enjoined by the federal court from taking any action regarding HPC's property. The respondent also knew that Wood was in an ongoing dispute with HPC as to whether or not Wood had been removed as a manager. HPC did not even discover that their Idaho property had been conveyed to third parties until January 2014. Thus, the evidence clearly and convincingly supports the PCC's finding that the respondent violated Rule 1.15.

### 4. Rule 3.4

Rule 3.4(c) states that a lawyer shall not "knowingly disobey an obligation under the rules of a tribunal . . . ." The record supports the PCC's finding by clear and convincing evidence that the respondent violated this rule when he knew of the preliminary injunction and chose to assist Wood to violate it, prompting the federal court to find the respondent and Wood in contempt.

10

### 5. Rule 8.4

There is ample evidence in the record that clearly and convincingly supports the PCC's finding that the respondent violated Rule 8.4(a) and (c) because he violated the Rules of Professional Conduct and engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation.  In addition to the evidence of violations discussed above, the respondent failed to advise North Idaho Title that a federal court had issued the preliminary injunction.  The respondent also disbursed funds from the sale of the property to third parties other than HPC, including himself, despite knowing that HPC had an interest in the property.

### III. Sanction

Having concluded that the respondent violated numerous Rules of Professional Conduct, we turn next to the appropriate sanction.  We retain the ultimate authority to determine the sanction for a violation of the Rules.  O'Meara, 164 N.H. at 179.  In determining a sanction, we are mindful that the purpose of attorney discipline is not to inflict punishment, but rather to protect the public, maintain public confidence in the bar, preserve the integrity of the legal profession, and prevent similar conduct in the future.  Young's Case, 154 N.H. 359, 368 (2006).  We judge each attorney discipline case upon its own facts and circumstances, taking into account the severity of the misconduct and any mitigating circumstances appearing in the record.  Id.

Although we have not adopted the American Bar Association's Standards for Imposing Lawyer Sanctions (2013), we look to them for guidance.  Id.  The Standards list the following factors for consideration in imposing sanctions: (a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors.  Standards, supra § 3.0; Young, 154 N.H. at 368.  We first categorize the respondent's misconduct and identify the baseline sanction.  O'Meara, 164 N.H. at 179.  After determining the sanction, we then consider the effect of any aggravating or mitigating factors on the ultimate sanction.  Id.  When there are multiple misconduct charges, "the sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct among a number of violations; it might well be and generally should be greater than the sanction for the most serious misconduct."  Id. at 179-80 (quotation omitted).

We first review the duties the respondent violated.  According to the PCC, the respondent violated duties to his clients, the legal system, and the public.  We agree.  In the Haase matter, the respondent violated his duty of loyalty by representing both the seller and an interested purchaser of the Fogg property.  As to the Florida matter, the respondent violated his duty to Blackport by failing to advise Wood and Blackport of his limitations in representing them

11

while the injunction was in place and by facilitating the sale of the Idaho property in violation of the injunction. Furthermore, by violating the injunction, the respondent violated his duty to obey court orders, an obligation that he owes to the legal system. His conduct during the Florida matter also violated the duties of candor and honesty that he owes to the public.

Next, we consider the respondent's mental state at the time of his violations, which may be one of intent, knowledge, or negligence. Id. at 180. The volitional nature of the acts, and not the external pressure that could potentially have hindered the judgment, is relevant. Id. The PCC determined that he acted knowingly and that the evidence supported an inference that the respondent "acted intentionally, that is, with a conscious objective to achieve a result." We agree. The respondent knowingly violated the federal injunction when he sought to consummate the sale of the Idaho property and disburse the funds at the direction of Wood. In addition, as to the Haase matter, the respondent knowingly brought a foreclosure action against Mr. Fogg for an amount exceeding what was owed to him.

Next, we consider the actual or potential injury caused by the respondent's misconduct. Id. The Standards define "injury" as harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. Conner's Case, 158 N.H. 299, 304 (2009). The PCC determined that the respondent caused serious injury to his client and third parties in the Florida matter and in the Haase matter. We agree.

The respondent's failure to comply with the federal injunction inflicted injury on the legal system and on his client. Disbursing the funds from the sale of the Idaho property under the direction of Wood, without informing HPC, inflicted injury on third parties, namely, HPC and its investors, who had title to the property and should have been informed about the transfer of the property. With respect to the Haase matter, representing both Ms. Fogg and Pan American Fund while issuing a promissory note and improperly representing the Fogg property as security, inflicted injury on both of the respondent's clients. Moreover, the respondent made a false statement when he represented to Haase that a $22,350 mortgage existed on the Fogg property and issued a foreclosure notice to Mr. Fogg demanding $47,891.13, without any legal or factual basis for doing so. "The privilege of practicing law does not come without the concomitant responsibility of truth, candor and honesty. Because no single transgression reflects more negatively on the legal profession than a lie, attorney misconduct involving dishonesty justifies disbarment." Young, 154 N.H. at 369 (quotation omitted). Considering the duties violated, the respondent's mental state, and the harm and potential harm caused, we conclude, as did the PCC, that the proper baseline sanction is disbarment. See Standards, supra §§ 4.11, 4.61, 5.11, and 6.21.

We next consider the effect of mitigating and aggravating factors upon the baseline sanction of disbarment. See Standards, supra § 9.1. The respondent asserts that there are numerous mitigating factors that we should consider, such as his public service to the legal community, his personal and financial issues, and his contention that his prior discipline offenses do not involve similar activity. The PCC found only one mitigating factor; the respondent's cooperation during the proceedings and throughout the ADO's investigation. Nonetheless, the PCC identified numerous aggravating factors: (1) the respondent acted dishonestly and selfishly when he misrepresented the status of the injunction to North Idaho Title by not disclosing its existence, and when he disbursed the proceeds from the sale of the Idaho property to parties other than HPC without informing HPC or seeking its assent; (2) the respondent committed multiple offenses involving serious violations; (3) Ms. Fogg was a vulnerable victim as she was recently divorced and pressed to sell the property within eighteen months to satisfy her debt to her ex-husband; (4) the Florida district court found the respondent jointly and severally liable for over $400,000 and he has not paid any portion of that judgment; (5) the respondent had substantial experience in the practice of law — over 40 years — when he was found in contempt of court in Florida, in 2014; (6) the respondent has not accepted responsibility for his actions, maintaining that they were unintentional mistakes, which the PCC found not credible; and (7) the respondent has a previous disciplinary record, including three public censures and a six-month suspension that was imposed in November 2017. These aggravating circumstances are in accord with those to consider under the Standards. Standards, supra § 9.2. The aggravating factors far outweigh the mitigating factors.

The respondent argues that the sanction should be proportional to the various transgressions and, if we determine that the rule violations did occur, then a lesser sanction than disbarment should be imposed. We are not persuaded. Given the lack of mitigating factors, and the presence of numerous aggravating factors, we conclude that disbarment is the proper sanction. Disbarment is necessary to protect the public and preserve the integrity of the legal profession when, as in this case, an attorney allows his personal interests to take precedence over his duty of loyalty to his clients. We further order the respondent to reimburse the attorney discipline system for all expenses incurred in the investigation and prosecution of this matter. Sup. Ct. R. 37(19).

So ordered.

LYNN, C.J., and HICKS and BASSETT, JJ., concurred.

13