Original
No. LD-2001-007

## SHERIDAN'S CASE

Argued: September 19, 2002
Opinion Issued: December 6, 2002

*McNeill, Taylor & Gallo, P.A.*, of Dover (*Robert J. Gallo* on the brief and orally), for the professional conduct committee.

*William C. Sheridan*, of Londonderry, by brief and orally, *pro se*.

BRODERICK, J. In August 2001, the Supreme Court Committee on Professional Conduct (Committee) filed a petition with this court against the respondent, William C. Sheridan, requesting that he be suspended for one year from the practice of law. We referred the petition to a Judicial Referee (*Dunn*, J.) for hearing and recommendation. Thereafter, the Committee served a request for numerous factual admissions upon the respondent. When he failed to respond, the referee issued, upon motion, an order declaring the requests admitted, which we subsequently approved. In sum, the admitted facts constituted violations of Rules 1.1(a), 1.1(b)(5), 1.1(c)(4), 1.3(a), 1.4(a), 1.16(d) and 8.4(a) of the New Hampshire Rules of Professional Conduct (the Rules). After a hearing on sanctions, the referee recommended that the respondent be suspended from the practice of law in New Hampshire for one year. We adopt the referee's recommendation.

The admitted facts are as follows. In the spring of 1999, two individuals sought the respondent's legal services to incorporate their business. The respondent, who was admitted to practice law in New Hampshire and Massachusetts, agreed to incorporate the business in Massachusetts. The respondent generated Articles of Incorporation from his computer, and on May 6, 1999, the incorporators signed the Articles and paid the respondent $1,300.00 for legal services and filing fees. He informed them that he would file the Articles in Massachusetts and obtain a corporate minute book and seal. On May 20, he provided the corporate minute book and seal to the

incorporators and told them that they were incorporated. They then began to operate their business. The respondent, however, did not deliver the original signed Articles to the Massachusetts Secretary of State until May 28.

Massachusetts rejected the corporate filing, and returned the Articles as well as the filing fee check to the respondent. The respondent's second attempt to incorporate the business also met with rejection. However, he did not realize that his second attempt had not been successful until ten or eleven months later. He never contacted the incorporators to notify them that the corporation was not properly formed.

The incorporators operated their business for nearly a year before learning that their incorporation papers had been rejected when Massachusetts refused to accept their 1999 corporate tax return. In May 2000, they confronted the respondent with their problem, and it took him approximately ten days to prepare new incorporation documents. In the meantime, the incorporators retained another lawyer to complete the incorporation process and requested the respondent to provide their case file to new counsel. He failed to do so because he could not find it.

In July 2000, the incorporators filed a professional conduct complaint against the respondent with the Committee. More than eight months later, the respondent supplied the case file to the Committee but still failed to provide the file to his former clients or their new counsel. Further, sometime after the complaint was filed, the respondent discovered $200.00 in his escrow account representing the original filing fee rejected by Massachusetts, which he returned to his former clients. The Committee conducted a hearing in May 2001, but the respondent failed to bring any files or bank records with him. At the hearing, the incorporators identified approximately $5,000 in damages caused by the respondent's failure to properly incorporate their business. Beyond returning the $200.00 filing fee, however, the respondent has not returned any of the sums received for legal services, nor has he made any payments toward the damages caused by his misconduct.

■ The respondent neither disputes the truth of the facts deemed admitted, nor does he challenge the referee's conclusion that the admitted facts constitute violations of the following Rules:

1.1(a) – failing to represent clients in a competent manner;
1.1(b)(5) – failing to pay attention to schedules and details in incorporating the client's business, so as to assure that the legal matters undertaken would be completed with no avoidable harm to the client's interest;

1.1(c)(4) – failing to undertake actions with regard to the incorporation in a timely and effective manner;

1.3(a) – failing to act with reasonable promptness and diligence;

1.4(a) – failing to keep the clients reasonably informed regarding the status of the matter;

1.16(d) – failing to return the clients' file at the termination of the representation; and

8.4(a) – engaging in conduct in violation of the Rules of Professional Conduct.

The respondent contends that the referee's recommended sanction of a one-year suspension is unduly harsh. He argues that the referee erroneously deprived him of his right to offer evidence to supplement or explain the admitted facts in order to mitigate his misconduct. In addition, based upon the results of an independent psychiatric evaluation which he presented to the referee, the respondent asserts that he has a mental disorder that serves as a mitigating factor and entitles him to reasonable accommodation under the Americans with Disabilities Act (ADA). *See* 42 U.S.C. §§ 12101 *et seq.* (2000). He asserts that the most appropriate sanction would be some form of probation during which he would be required to limit the number of cases he handles in order to provide him "an opportunity to develop his practice, get secretarial help and prove that he [can] perform with attention to detail."

"We retain the ultimate authority to determine the appropriate sanction for a violation of the rules governing attorney conduct." *Morgan's Case,* 143 N.H. 475, 476-77 (1999). We judge each case on its own facts and circumstances. *Id.* at 477. Our ultimate aim in fashioning a sanction is not to inflict punishment on the offending attorney; rather, we seek "to protect the public, maintain public confidence in the bar, preserve the integrity of the legal profession, and prevent similar conduct in the future." *Id.* (quotation omitted).

■ We first address the respondent's contention that the referee erroneously denied him the right to present evidence supplementing and explaining the admitted facts in order to demonstrate relevant mitigating circumstances. Assuming, without deciding, that he had such a right and that he properly preserved it for our review, we conclude that none of the additional evidence described by the respondent mitigates his misconduct.

Specifically, the respondent asserts that the Articles returned to him by Massachusetts bore notations on the first and last pages reflecting initial approval. He contends that "[l]ater, Massachusetts revoked its acceptance of the Articles [by] whit[ing] out [the] acceptance on the last page" but that "acceptance remained noted on the first page." According to the

respondent, the Articles were returned to him without a cover page and, because he did not have a secretary, he noticed only the acceptance on the first page and not the rejection on the last page. He claims that in late April or early May 2000, because he had hired a secretary, he discovered that the Articles had actually been rejected. The incorporators soon thereafter confronted him with the defective incorporation, and, he contends, within the next ten days, he spoke with them on several occasions, providing them with new incorporation documents on the tenth day.

The relevance of much of this evidence to the issue of sanctions is questionable. The respondent's initial misperception of the status of the Articles, given the apparent discrepant notations on the first and last pages, bears more on the issue of whether he is culpable in the first instance for failing to pay attention to detail (Rule 1.1(b)(5)). Likewise, his discovery of the defective incorporation shortly before the incorporators confronted him relates to whether he failed to act with reasonable promptness and diligence (Rule 1.3(a)), or failed to keep his clients reasonably informed (Rule 1.4(a)). These issues are probative of whether the respondent violated the Rules of Professional Conduct.

In any event, none of the evidence mitigates the respondent's misconduct. Whether or not the returned incorporation documents lacked clarity in communicating their rejected status, his receipt of the uncashed filing fee check should have been an obvious indicator that his effort to incorporate failed. The respondent, however, did not even notice that the check had been returned because he only first discovered the $200 in his escrow account *after* the incorporators filed an ethical complaint against him. Further, regarding his late discovery of the failed incorporation, the respondent admitted that he "has no explanation for his failure to notify the incorporators immediately upon his discovery that [the corporation] had not been properly incorporated." Indeed, since it was the incorporators who first confronted him on his failed incorporation effort, we have no way of knowing just how long the respondent would have waited before contacting them or taking steps to remedy his mistake. The delay was unacceptable given the incorporators' continued exposure to personal liability with each passing day.

We do not consider the evidence the respondent sought to introduce regarding his contact with the incorporators during the ten-day period following their phone call to him in May 2000. Any evidence tending to demonstrate his attempt to take immediate steps to remedy his mistake contradicts two admissions of fact: (1) "After the incorporators notified [the respondent] that their corporate tax return had been rejected because [their business] was not a corporation, [the respondent] did not take

immediate action to rectify the situation"; and (2) "When contacted by the incorporators in May of 2000 concerning the fact that [the business] was not incorporated, [the respondent] became aware of the urgency of the situation, but failed to take immediate action to rectify the situation."

The respondent also seeks to explain his admission that he has made no payment to the incorporators, excluding the $200.00 filing fee. He asserts that he has always been willing to reimburse the incorporators and the corporation for damages caused by his conduct but that they have failed to provide him with an itemized list of actual out-of-pocket expenses. The admitted facts belie this claim.

At a May 2001 hearing before the Committee, the incorporators identified approximately $5,000 in damages caused by the respondent's failure to incorporate their business. These damages were attributed to additional accounting and legal expenses relating to incorporation services provided by new counsel and to the state and federal tax returns filed for 1999. The only unknown damages presented at the May 2001 hearing were: (1) any interest and penalties Massachusetts might assess for filing the 1999 corporate tax return before incorporation; and (2) any personal liability for claims that may be incurred by the incorporators which otherwise would have been incurred by the corporation. The estimated $5,000 in damages was sufficiently precise for the respondent to have made some payment. To date, more than one and one-half years later, no payment in any amount has been made.

■ As a final mitigator, the respondent claims that he has "a mental disorder with a probable biological basis" and that psychiatric medication and use of a secretary would "ameliorate the problem." He claimed to be taking the appropriate medication and blames his lack of a secretary on the Committee for taking past action against him which "wrongfully chilled his ability to advertise [for Bankruptcy clients, his primary area of practice], obtain income and thus obtain a secretary." We conclude that while his apparent mental disorder may offer some explanation for his ethical lapses, it does not justify a lenient sanction.

During the sanctions hearing, the respondent submitted an independent psychiatric evaluation to establish the existence of his apparent mental disorder and explain its effect on his behavior. In November 2001, Dr. Albert Drukteinis conducted the evaluation pursuant to our order in another matter, and opined that the respondent had "a mental disorder with a probable biological basis which [could] benefit from psychiatric treatment." He described the respondent as apparently suffering spells of fatigue and poor mental functioning alternating with periods of high energy and "physical disorder." The doctor did not provide a definitive

diagnosis of the respondent's apparent mental disorder, but noted that the respondent's "presentation is characteristic of hypomania seen in Bipolar Disorder (formerly known as Manic Depressive Illness)." He outlined general characteristics of individuals who suffer from Bipolar Disorder to include a tendency to be distracted and disorganized, failing to prioritize or balance their activities appropriately, and intensely pursuing certain objectives at the cost of other obligations. With respect to the respondent in particular, the doctor stated that his "tendency for distractibility and disorganization could easily lead him to miss deadlines as he is hyperfocusing on a project," and that his "mental state deficits are subtle; but, with the high standard of performance that an attorney must maintain, those deficits could be devastating."

The respondent claims that he can overcome his lawyering deficiencies caused by his mental disorder through the structure and organization provided by a secretary. He contends that the Committee engaged in wrongful action against him in the past, which curtailed his primary source of income and forced him to discharge his secretary. Assuming, without deciding, however, that the respondent suffered a mental disorder during the time frame at issue, the mental disorder did not account for much of the misconduct underlying the ethical violations.

The respondent failed to obtain or prepare the proper documents for the Massachusetts incorporation. He told the incorporators that their business had been incorporated a week before he had even filed any documents with the Secretary of State. He never noticed that the uncashed filing fee check was returned to him, or if he did, he failed to understand its significance. Moreover, once he finally discovered the incorporation documents had been rejected, (through, he contends, the aid of a secretary), he failed to appreciate the urgency of the situation and made no attempt to immediately notify the incorporators or remedy his mistake. All of these actions demonstrate grave errors in his professional judgment, which administrative support cannot ameliorate.

■ The respondent also claims that his apparent mental disorder constitutes a disability under the ADA, and thus requires us to provide him with "reasonable accommodation." He seeks a more lenient sanction of probation to give him an opportunity to financially restore his practice, obtain a secretary and "prove that he could perform with attention to detail." We assume, for the sake of argument, that his ADA claim is properly preserved in the record before us and that we have jurisdiction to adjudicate an ADA claim in the first instance. The evidence presented to the referee, however, is inconclusive as to whether the respondent suffered a "disability" recognized under the ADA.

Dr. Drukteinis made no definitive diagnosis of the respondent's apparent mental disorder. He concluded only that the respondent has a "mental disorder with a probable biological basis which can benefit from psychiatric treatment," incurs alternating fatigued and high energy periods and has a tendency for distractibility, disorganization and hyperfocusing on a project to the detriment of other priorities. While the doctor suggested that he may suffer from "hypomania seen in Bipolar Disorder," he offered no definitive diagnosis and deferred the prescription of appropriate medication to the respondent's treating physician. Accordingly, we conclude that Dr. Drukteinis' report is insufficient to establish the existence of a disability under the ADA. *See* 42 U.S.C. § 12102(2) (disability defined as a physical or mental impairment that substantially limits one or more of an individual's major life activities; a record of such an impairment; or being regarded as having such an impairment); *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 196-98 (2002) (claimant must establish that the extent of the limitation caused by the impairment in terms of claimant's own experience is substantial; mere evidence of medical diagnosis of an impairment is not enough).

The respondent identifies no viable mitigators convincing us to impose a sanction less harsh than suspension. His misconduct demonstrates grave errors in professional judgment in his failure to obtain or prepare updated incorporation documents, misrepresentation of the status of the corporation before he filed incorporation documents, and patent neglect and lack of diligence in apprising his clients of their lack of corporate status, further exposing them to potential liability.

In addition, the respondent has a prior disciplinary record. In the last four years of his fifteen-year law career, we have sanctioned him on three occasions. In 1998, he was publicly censured twice, once for admittedly commingling trust and operating accounts, and again for allowing a civil matter to default. In 2001, he was publicly censured for his lack of diligence and competence in his handling of the probate of a decedent's estate. *See Sheridan's Case*, 146 N.H. 736, 739 (2001).

■ We are mindful that suspension is a severe disciplinary measure for any attorney, and do not undertake this sanction lightly. Furthermore, we are sympathetic to the fact that the respondent has suffered various misfortunes in his personal life over the past several years, as revealed in the record. Certainly, these circumstances compounded his apparent mental condition and complicated his ability to remain focused, organized and attentive to detail. Attorneys, however, must maintain a competent level of performance even while suffering trying times in their personal lives. They must be sensitive to the impact external pressures have on

their ability to sustain their professional obligations to their clients, and should step aside from their legal representation before their professional obligations are compromised. *See Farley's Case*, 147 N.H. 476, 478 (2002); *Welt's Case*, 136 N.H. 588, 593-94 (1993).

■ After reviewing the admitted facts and considering the respondent's prior discipline, we conclude that suspending the respondent's license to practice law is necessary to protect the public, maintain public confidence in the bar, preserve the integrity of the legal profession, and prevent similar conduct in the future. Accordingly, we order the respondent suspended from the practice of law in New Hampshire for one year, and direct him to reimburse the Committee for all expenses incurred in the investigation and prosecution of this matter. *See* SUP. CT. R. 37(16).

*So ordered.*

BROCK, C.J., and NADEAU, DALIANIS and DUGGAN, JJ., concurred.