NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release.  The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Professional Conduct Committee
No. LD-2019-0001

MESMER'S CASE

Argued: October 10, 2019
Opinion Issued: February 21, 2020

Sara S. Greene, disciplinary counsel, of Concord, on the brief and orally, for the Attorney Discipline Office.

Upton & Hatfield, LLP, of Portsmouth (Russell F. Hilliard and Brooke Lovett Shilo on the brief, and Mr. Hilliard orally), for the respondent.

BASSETT, J.  On February 19, 2019, the New Hampshire Supreme Court Professional Conduct Committee (PCC) filed a petition in which it found that the respondent, Joshua N. Mesmer, violated Rules 1.1, 1.2, 1.3, 1.4, 1.5, 3.3, 8.4(a), and 8.4(c) of the New Hampshire Rules of Professional Conduct while serving as counsel in a case litigated from December 2015 to November 2016.[1] The PCC has recommended that the respondent be suspended from the practice of law for three years, and, provided that the respondent pays for the costs of investigating and prosecuting this matter and engages in no further professional misconduct, that 18 months of the suspension be stayed.  The respondent challenges the recommended sanction, arguing that, because he was suffering from severe sleep apnea during the period of representation, he was unable to form the "knowing" state of mind necessary for a number of the

---

[1] In this case, the respondent represented a married couple.  For ease of reference, we refer to the couple as "the client," "she," or "her."

ethical violations, and that his sleep apnea is a significant mitigating factor in determining the proper sanction. The respondent argues that he should receive a fully-stayed suspension. We adopt the PCC's recommended sanction.

The following facts were either found by the PCC or are supported by the record, which includes testimony from an evidentiary hearing held before a hearing panel appointed by the chair of the hearings committee of the attorney discipline system. See Sup. Ct. R. 37A(III)(b)(4). The respondent was admitted to the Massachusetts Bar in 2006, and the New Hampshire Bar in 2007. He began his legal career as an assistant county attorney in the Hillsborough County Attorney's Office. In 2012, he left that position to become an associate in his father's law firm: Mesmer & Deleault, PLLC in Manchester (the Mesmer law firm).

The conduct code violations at issue arise from the respondent's representation of the client in a fraudulent conveyance action between December 2015 and November 2016. The respondent's relationship with the client began in 2012, when the Mesmer law firm represented a company, owned by the client, that had been sued by Motostar Tire and Auto Products, Inc. (Motostar). Motostar obtained a judgment of approximately $165,000. Motostar and the company negotiated a payment plan, but the company failed to make the required payments. In December 2015, Motostar filed a Petition to Set Aside Fraudulent Conveyance against the company and the client.

On January 6, 2016, the respondent agreed to accept service on the client's behalf. Also on January 6, the respondent e-mailed Paul DeCarolis, counsel for Motostar, stating, "After reviewing your Petition to Set Aside Fraudulent Conveyance, I am curious as to what money or assets you're referring to as having been transferred fraudulently. Perhaps we can figure this out together." The respondent e-mailed a copy of the fraudulent conveyance petition to the client, and stated that he was "drafting an Objection to the Petition and a Motion to Dismiss to boot." The respondent also represented that he would send the client a copy of the pleadings on January 6 or 7.

On January 8, the client e-mailed the respondent, asking if he had sent her the motion to dismiss. The respondent replied by e-mail the same day, stating that he and his colleagues were researching fraudulent conveyance law "a little further" before filing. On January 22, the client again e-mailed the respondent, asking if the motion to dismiss had been filed. On January 23, the respondent replied, "No stress . . . . We are working on it . . . . You can expect to see some movement on our end by Tuesday."

Despite these repeated assurances, the respondent did not file a motion to dismiss, or any other responsive pleading. The respondent's billing records

show no entries after January 15 regarding a response to the fraudulent conveyance petition. The superior court issued a notice of default on February 26.

On March 14, DeCarolis e-mailed the respondent, asking, "Did defendants intend to default in the fraudulent conveyance action?" On the same day, the respondent replied, "Not at all. Did you not receive a copy of the response?" Just two minutes later, DeCarolis responded, "No, only the default notice." On March 18, DeCarolis followed up in the same e-mail thread, stating, "I have not seen anything." The respondent did not reply to DeCarolis' final March 14 e-mail or his March 18 e-mail. Nor did the respondent contact the court to determine whether it had received any pleadings from him.

On April 6, DeCarolis filed a motion for final judgment, mailing copies to both the respondent and the client. The respondent did not object, and the motion was granted on April 28.

On May 6, the client received a notice of final decision from the court. This notice was her first update on the case since January. Later that day, she called the respondent and informed him of the notice. This conversation is memorialized in the respondent's billing records: two entries from May 6 state, "Call from [the client]; received Notice of Final Decision; will fax to my attention," and "To conduct investigation; discuss with Rebekah [a paralegal]. Will prepare appropriate response if necessary."

On June 6, a default judgment of over $120,000 was entered against the client. On June 4, 7, 16, and 29, the client e-mailed the respondent asking about the status of the Motostar case, whether a motion to dismiss had been filed, and how the default had occurred. The respondent did not address any of these inquiries; rather, in June he sent the client one e-mail, which concerned a different matter.

On July 1, Motostar obtained a writ of execution, which the Hillsborough County Sheriff served on the client. In execution of the writ, Motostar sought the client's shares of stock in another company. That same day, the respondent met with the client, and he memorialized the meeting in an e-mail sent to her on the night of July 1:

> I am writing to follow up on our meeting this morning. I put in a call to Paul DeCarolis, but he's out of the office today because of the holiday. I've been working on a Motion and Supporting Memorandum and plan on finishing them over the weekend. They will be filed in Nashua Superior first thing Monday morning. I will e-mail you copies when they are done.

3

. . . .

> Try and enjoy the weekend. And know that I am working hard to get this matter straightened out once and for all.

On July 5, the client e-mailed the respondent, expressing anxiety about the case and asking the respondent if he was filing an "appeal" that day. The respondent quickly replied, "Yes. Be in touch soon." The respondent did not file anything with the court during the week of July 4. The respondent later admitted that he had lied in his July 1 and 5 representations to the client.

On July 14, the Sheriff served the writ of execution on the respondent as registered agent of the client's company. On July 15, Motostar filed a motion for <u>ex parte</u> relief, and the court ordered the client to produce their stock certificates by July 18. The court also scheduled a hearing on the <u>ex parte</u> motion for July 22. On July 15, the respondent spoke with the client, who was very concerned about these developments.

On July 18, the respondent sent a text-message to the client, stating that he had informed the Sheriff "that an expedited motion to stay execution of judgment has been filed and that it shouldn't be enforced until a ruling has been made." When the client expressed anxiety about defying the court's order to surrender her stock certificates that day, the respondent stated, "They can't arrest you with a motion pending." Despite the respondent's representations that he had filed the motion to stay on July 18, the court docket sheet reveals that the motion was not filed until July 19.

In the motion to stay, the respondent represented that "Defendants filed a timely response and have received no information pertaining to this matter since that time and to date." Motostar filed an objection to the motion on July 20, and e-mailed a copy of the objection to the respondent that day. In the objection, Motostar attached as exhibits DeCarolis' March 14 and 18 e-mails with the respondent, and also represented that the respondent had been copied on the motion for final judgment filed in April.

On July 22, the client traveled with the respondent to the hearing on Motostar's motion for <u>ex parte</u> relief. As they traveled, the respondent admitted to the client that he had not filed an answer or any other responsive pleadings in the case. Following the July 22 hearing, the court granted Motostar's motion for <u>ex parte</u> relief, and ordered the client to deliver her stock certificates to the Hillsborough County Sheriff by July 25. The trial court also stated during the July 22 hearing that the respondent was free to file a motion to vacate default on the client's behalf at any time.

4

Between July 22 and September 13, the respondent made a series of intentional misrepresentations to the client, in which he stated falsely that various pleadings would soon be, and/or had already been, filed. For example, on July 25, the respondent told the client that he was working on an "appeal," and that he was "not stopping until we have won and finished this once and for all." On August 5, the respondent told the client that "the pleadings have been filed and now we wait." In fact, the respondent had not filed anything. The respondent also billed the client for drafting client affidavits on July 28, and filing pleadings on July 29, even though he made no filings on July 29, and there is no evidence that he met with the client to sign affidavits during this time period.

On August 10, the respondent texted the client that he was "[w]orking on motions" to be filed "first thing in the morning." When the client replied that she thought those motions had already been filed, the respondent replied, falsely, "Oh no, I definitely filed motions after our hearing, but clearly we need more." On the same day, the respondent told the client, falsely, that he was working with his father to "clear . . . up" problems in the case.

On September 2, the client asked, "were the papers filed??" The respondent replied, falsely, "Yes." On September 7, the respondent represented to the client that he was drafting a "supplemental motion"; the respondent admitted during his testimony before the hearing panel that he had described the filing as "supplemental" in order to maintain the false impression that pleadings had already been filed. The respondent also represented to the client that he had heard "[n]othing" about "last week's filings," even though there were no filings from the prior week.

Throughout this period, the client sent the respondent near-daily messages seeking updates on the case, and stating that the case was causing her significant stress and anxiety. The respondent often did not reply to these messages. When he did, he never told the client the truth: that he had filed no pleadings, and thus nothing was pending before the court.

Finally, on September 13, the respondent filed his first pleadings in the case since July. These filings included numerous misrepresentations. In a motion to accept late filing, the respondent represented that he had intended to file a limited appearance in February. In an attached affidavit, he certified that "[b]ecause undersigned counsel filed a Limited Appearance for the sole purpose of responding to Plaintiff's Petition, he at all times believed [the client was] receiving and handling any and all correspondence from Plaintiff and the Court." The respondent had not obtained the client's informed consent to a limited representation. Notably, although the respondent had represented the client since 2012, he had never done so on a limited basis.

5

In a motion to vacate default judgment, the respondent represented that it was not until July 2016 "that Defendants . . . were first notified of this action and its procedural posture." The motion to accept late filing also included an affidavit from the client, in which she similarly stated that "[f]rom [the filing of the complaint] until July of 2016, we received nothing from Plaintiff in the way of pleadings, nor anything from the Court in the way of Court Orders. . . . It was not until the Sheriff arrived . . . in July 2016 that we were notified that Plaintiff had secured a default judgment against us." The respondent testified that, at the time the affidavits were prepared, he did not recall DeCarolis' March e-mails about the default, the May 6 call with the client about the notice of final decision, or the client's June e-mails referencing the default.

By August 10, the respondent had received notice that a sheriff's sale of the client's stock certificates had been scheduled for September 15 at 10:00 a.m. On September 13, the court denied the respondent's motion to stay the sheriff's sale. On September 15, the court denied the respondent's motion to reconsider its September 13 order. The respondent then texted the client, describing the rulings as "the most corrupt backwards shit I've ever seen in my years as an attorney," and stating that "decarolis had the Nashua superior in his pocket since he and his firm litigate there on a near weekly basis."

At 10:07 a.m. on September 15, DeCarolis e-mailed the respondent asking if he was coming to the sheriff's sale. At 12:56 p.m., after the sale had concluded, the respondent texted DeCarolis, asking, "where are we at with everything auction-wise[?]" At 4:03 p.m., despite these messages, and despite the fact that the sale had already occurred as scheduled, the respondent texted the client that she "might want to call Matt Estey sheriff and tell him your appealing case and it's being filed tomorrow and he will hold off."

Despite this representation, the respondent never filed an appeal with this court. Around this time, the respondent also falsely represented to the client that his father was reviewing an appeal with this court. Although no appeal was filed, the respondent billed the client more than $600 for appeal-related work.

On September 21, the court set a hearing for October 19 on pending motions, including motions the respondent had filed on September 13 to vacate default judgment and dismiss the fraudulent conveyance action. On September 22, Motostar filed a "Motion to Extend Time to Respond to Defendants' Motion to Dismiss." In the motion, Motostar noted that the client had to obtain a favorable ruling on her motion to vacate default judgment before the merits of the motion to dismiss could be considered. Around September 23, the respondent informed DeCarolis that he had no objection to Motostar's motion to extend. The court granted the motion to extend on September 30.

6

After the motion to extend was granted, the only issue to be considered at the October 19 hearing was the motion to vacate default judgment. Despite this procedural posture, between September 23 and October 18, the respondent billed the client $4,400 for 22 hours spent preparing witnesses and exhibits for a hearing on the motion to dismiss. On October 13, the respondent e-mailed the client about her bill, stating, "I am catching a lot of heat for not getting a retainer before we started litigating this matter. If it's at all possible to make even a partial payment toward [your] balance . . . it would help me out a lot." In all, the respondent billed the client more than $23,000 for his work on the July and September filings, and his preparation and attendance at the October 19 hearing.

Following the October 19 hearing, the respondent texted the client that he was "very sorry that the hearing didn't play out as hoped, but I can't say I'm all that surprised." Despite this acknowledgment, the respondent told the client, "I don't feel any less confident now than I did before the hearing." The respondent also informed the client that "[a]dditional motions are being filed today or in the morning," and that he and his father felt "confident in [their] supplemental position." The client testified before the hearing panel that it was only after the October 19 hearing that she realized the extent of the respondent's misrepresentations to her.

On November 2, the court denied the motion to vacate default judgment, and deemed the motion to dismiss moot. Shortly thereafter, the client terminated her engagement with the respondent. On November 4, DeCarolis made a referral regarding the respondent to the Attorney Discipline Office (ADO), attaching the November 2 order from the superior court.

On September 11, 2017, the ADO issued a notice of charges alleging that the respondent had violated Rules 1.1, 1.2, 1.3, 1.4, 1.5, 3.3, 8.4(a), and 8.4(c) of the New Hampshire Rules of Professional Conduct. On June 11, 12, and 14, 2018, the hearing panel appointed by the chair of the hearings committee held an evidentiary hearing. At that time, a number of witnesses testified: the respondent, the respondent's father, the client, DeCarolis, a licensed clinical mental health counselor who had treated the respondent, and experts on sleep apnea retained by both the respondent and the ADO.

During the hearing, the respondent conceded that he had violated Rules 1.1, 1.2, 1.3, 1.4, 1.5, and 8.4(a). Although he acknowledged that he had violated Rule 8.4(c), he contested certain "aspects" of the charged conduct. In addition, the respondent denied that he had violated Rule 3.3. The respondent testified that, during 2016, he had been "unwell," and that he "fell behind" in a number of his cases, including the matter at issue here. He explained that, after experiencing several years of unexplained health problems, including fatigue, swelling, and abdominal pain, in approximately March of 2017 he was

diagnosed with obstructive sleep apnea. The respondent testified that, after beginning treatment for sleep apnea in 2017, he has been less fatigued, and his professional performance significantly improved.

The respondent argued that, during his representation of the client, his cognitive functioning was impaired such that he was unable to "knowingly" make false statements to the court, and that he therefore lacked the requisite mental state for a Rule 3.3 violation. The ADO countered that the respondent was, in fact, capable of forming the "knowing" state of mind necessary for a Rule 3.3 violation, and that he had committed all of the Rules violations alleged in the notice of charges. On November 2, 2018, the hearing panel found, by clear and convincing evidence, that the respondent had violated Rules 1.1, 1.2, 1.3, 1.4, 1.5, 3.3, 8.4(a), and 8.4(c), and recommended that he be suspended for 18 months.

Oral argument was held before the PCC on January 15, 2019. The respondent argued that the hearing panel had failed to adequately consider the extent to which sleep apnea had contributed to his misconduct. The respondent argued that, due to sleep apnea, he was suffering from oxygen desaturation in his brain, which inhibited his judgment and ability to fully comprehend the consequences of his actions. The respondent also argued that he was now "recovered" from his condition, and that, consequently, a fully-stayed suspension would better serve the purposes of attorney discipline than the 18-month suspension recommended by the hearing panel.

After considering the record before the hearing panel and the parties' arguments, the PCC adopted the hearing panel's findings of fact as supported by clear and convincing evidence. See Sup. Ct. R. 37A(III)(d)(2)(C). The PCC also found, by clear and convincing evidence, that the respondent had violated Rules 1.1, 1.2, 1.3, 1.4, 1.5, 3.3, 8.4(a), and 8.4(c). To determine a recommended sanction for the respondent's violations, the PCC referred to the American Bar Association's Standards for Imposing Lawyer Sanctions. The PCC found that, before consideration of aggravating and mitigating factors applicable to the respondent's conduct, the "baseline" sanction for the respondent's violations was disbarment under Standards §§ 4.41, 4.61, and 7.1. See Annotated Standards for Imposing Lawyer Sanctions, § 4.41, at 178; § 4.61, at 199; § 7.1, at 341 (2015). The PCC then considered aggravating and mitigating factors that it found applicable to the respondent's conduct, and determined that the case "present[ed] a close[] call between . . . disbarment versus suspension." Ultimately, the PCC recommended that the respondent be suspended for three years, with 18 months of the suspension stayed, provided that the respondent engages in no professional misconduct, and pays for the costs of investigation and prosecution of this matter. The PCC filed its recommendation with this court, as required for any recommended sanction greater than six months. See Sup. Ct. R. 37(16)(b).

8

"In attorney discipline cases, we defer to the PCC's factual findings if supported by the record, but retain ultimate authority to determine whether, on the facts found, a violation of the rules governing attorney conduct has occurred and, if so, the sanction." Salomon's Case, 171 N.H. 694, 700 (2019). We begin by reviewing the PCC's finding, by clear and convincing evidence, that the respondent violated eight Rules of Professional Conduct: Rules 1.1, 1.2, 1.3, 1.4, 1.5, 3.3, 8.4(a), and 8.4(c). See id. The PCC's finding as to each of these Rules is supported by the record.

We first address Rules 1.1, 1.2, 1.3, 1.4, 1.5, 8.4(a), and 8.4(c). The respondent has acknowledged violating each of these Rules, and we find that the record supports the PCC's conclusion that the respondent did, in fact, violate each of them.

Having upheld the PCC's findings regarding seven of the eight alleged Rules violations, we now turn to Rule 3.3. Rule 3.3(a) provides, in pertinent part, that a lawyer "shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Under the Rules, "knowingly" is defined as "actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances." N.H. R. Prof. Conduct 1.0(f). As he did before the hearing panel, the respondent argues that, because sleep apnea severely impaired his memory, his false statements to the court were not made "knowingly." The respondent argues that his mental faculty was impaired such that he "believed he was providing the court with correct information." We find, however, that the PCC's finding of a Rule 3.3 violation is supported by clear and convincing evidence.

The PCC adopted the factual findings of the hearing panel, which heard extensive expert testimony on the issue of sleep apnea on behalf of both the respondent and the ADO. The panel also reviewed several years of the respondent's medical records. In regard to sleep apnea, the panel concluded, "it is likely that Mr. Mesmer had OSA [obstructive sleep apnea] during 2016. The Panel agrees that this condition may have adversely affected some of Mr. Mesmer's functioning, in that his concentration and attention to detail may not have been at optimal levels." However, after "[c]onsidering the testimony of both doctors, as well as the medical records submitted into evidence," the hearing panel found "that sleep apnea did not impair Mr. Mesmer's cognitive function to such an extent that he was incapable of achieving a 'knowing' state of mind for purposes of a Rule 3.3 violation."

To the extent that the medical testimony regarding sleep apnea conflicted, "as a fact-finding tribunal, the PCC was at liberty to resolve any conflict in the evidence and to accept or reject such portions of the testimony as it saw fit." Salomon's Case, 171 N.H. at 700-01 (quotation omitted).

Moreover, even the respondent's own expert witness, Dr. Neal, acknowledged that he did not review the notice of charges against the respondent, and that, in his report, he did not opine as to whether any action taken by the respondent was likely caused by sleep apnea. When asked whether sleep apnea could have caused the respondent to present something to the court as true that was actually false, Dr. Neal responded only that "it could be" that sleep apnea caused the respondent to make misrepresentations. (Emphasis added.) Given that Dr. Neal was unwilling or unable to state with greater certainty that sleep apnea caused the respondent to make misrepresentations to the court, the PCC found that "Dr. Neal's opinions as to the causal link between sleep apnea and [the respondent's] conduct were tenuous. The Committee . . . cannot give more weight to [the respondent's] condition than did his own expert."

There is also extensive circumstantial evidence to support the PCC's finding that the respondent "knowingly" made misrepresentations to the court. Despite the respondent's July 19 representation to the court that the client had filed a response and had not received any subsequent information about the case, several acts by the respondent suggest that he knew this assertion was untrue: the respondent (1) replied to DeCarolis' March e-mail asking if the client had intended to default, (2) memorialized his May phone call with the client about her receipt of the notice of final decision, (3) received four e-mails from the client in June in which she inquired about whether the case had been dismissed and how the default had occurred, (4) acknowledged that he was aware that mandatory discovery would have been triggered had an answer been filed, yet he did not follow up with DeCarolis to initiate discovery, and (5) while en route to the July 22 hearing, admitted to the client that he had not filed an answer. These facts also support the PCC's finding that the respondent knowingly made false statements to the court on September 13, when he claimed that neither he nor the client received any updates on the case between January and July.

Other evidence suggests that the respondent knew that additional representations made on September 13 were untrue: that he had intended to file a limited appearance, and therefore thought that the client was handling correspondences from the court and Motostar. The respondent admitted that he had never obtained the client's informed consent to a limited representation. The respondent had also previously received multiple correspondences about the case from DeCarolis. In addition, the respondent had represented the client without a limited representation agreement for years, and the client had sent the respondent numerous messages in which she desperately inquired about the status of the case.

Finally, the respondent had the ability to confirm the truth or falsity of many of the representations that he made, in writing, to the court. For

example, a simple review of the docket or a call to the court would have revealed that no answer or limited appearance had been filed.  As the hearing panel found, "It is not credible that an attorney, truly baffled by the dire messages he was receiving from opposing counsel and his client, would not make that call [to the court]."  Although the respondent testified that he forgot major events, and therefore that his false statements to the court were not made knowingly, the hearing panel and the PCC were at liberty not to credit this testimony.  See Salomon's Case, 171 N.H. at 700-01; O'Meara's Case, 164 N.H. 170, 178 (2012).  Therefore, we uphold the PCC's finding, by clear and convincing evidence, that the respondent's July 19 and September 13 misrepresentations to the court were made "knowingly," and that the respondent therefore violated Rule 3.3.

Having upheld the PCC's finding that the respondent violated Rules 1.1, 1.2, 1.3, 1.4, 1.5, 3.3, 8.4(a), and 8.4(c), we next turn to determining the appropriate sanction.  Salomon's Case, 171 N.H. at 706.  The PCC recommended a three-year suspension, with 18 months stayed, provided that the respondent pays the costs of investigating and prosecuting this matter, and engages in no further professional misconduct.  The respondent, while acknowledging that he violated numerous Rules, argues that he should receive a fully-stayed suspension.  For the following reasons, we uphold the PCC's recommended sanction.

In determining the proper sanction, "we remain mindful that the purpose of attorney discipline is not to inflict punishment, but rather to protect the public, maintain public confidence in the bar, preserve the integrity of the legal profession, and prevent similar conduct in the future."  Grew's Case, 156 N.H. 361, 365 (2007) (quotation omitted).  We judge each case on its own facts and circumstances, taking into account the severity of the attorney's misconduct and any mitigating circumstances appearing in the record.  Young's Case, 154 N.H. 359, 368 (2006).  Although we have not adopted the American Bar Association's Standards for Imposing Lawyer Sanctions, we look to them for guidance.  Salomon's Case, 171 N.H. at 706.  In accordance with the Standards, we first determine the appropriate "baseline" sanction by considering (1) the ethical duties violated by the lawyer, (2) the lawyer's mental state at the time of the violations, and (3) the extent of the actual or potential injury caused.  See id.; Standards, supra § 3.0, cmt. at 113-128.  We then consider the effect of applicable aggravating and mitigating factors to arrive at the ultimate sanction.  Salomon's Case, 171 N.H. at 706.

We begin by assessing whether the respondent violated duties to the client, the public, the legal system, or the legal profession.  See Standards, supra § 3.0, cmt. at 117.  The PCC found, and we agree, that the respondent violated duties to the client, the legal system, and the public.  The respondent violated duties to the client by lying to the client, not representing the client

diligently, failing to adequately communicate with the client, and charging unreasonable fees. He violated duties to the legal system through his knowing misrepresentations to the court. All of the respondent's misrepresentations violated his duties to the public, as "public confidence in the bar" is undermined whenever an attorney is dishonest. See Grew's Case, 156 N.H. at 365-66. Although not referred to by the PCC, we also find that the respondent's dishonesty was a breach of his duty to the legal profession, as "the injury to the integrity of the legal profession is substantial whenever an attorney engages in deceit. No single transgression reflects more negatively on the legal profession than a lie." Bosse's Case, 155 N.H. 128, 132 (2007) (quotation and brackets omitted). Thus, we find that the respondent violated duties to the client, the public, the legal system, and the legal profession.

Turning next to the respondent's mental state, we find that the respondent acted at least knowingly, and, at times, intentionally. Under the Standards, a lawyer's mental state can be intentional, knowing, or negligent. Standards, supra § 3.0, cmt. at 120. Intent is the "conscious objective or purpose to accomplish a particular result," while knowledge is the "conscious awareness of the nature or attendant circumstances of the conduct, but without the conscious objective or purpose to accomplish a particular result." Id. at 121-22 (quotations omitted). The respondent acknowledged that at least some of his violations, including his misrepresentations to the client from July 22 to September 13, were intentional. The respondent contends that he made these misrepresentations "to ameliorate the [client's] anxiety." The PCC did not agree that the respondent's motives were so selfless, and, as further explained below, we agree that the respondent acted with a selfish motive. See Standards, supra § 4.61, at 199; § 7.1, at 341. Because the respondent had conscious awareness of the nature of his conduct, the respondent's other violations, including his misrepresentations to the court, failures to update the client, and failures to make timely filings, were committed at least knowingly.

As for the injuries caused by the respondent, they are both actual and serious. "Injury is harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from serious injury to little or no injury . . . ." Standards, supra at xxi (quotations omitted).

The most serious injuries were to the respondent's client. The respondent stated that he believed the client should have prevailed on the merits of the fraudulent conveyance action. However, because of his neglect, a default judgment was entered against the client, and the client was forced to surrender her stock certificates in one of her businesses. Although the Mesmer law firm eventually repaid the client for the value of that ownership interest, the client may have wished to retain that interest, rather than involuntarily and precipitously liquidate it. Also significant is the immense stress the client

12

suffered due to the litigation, which was greatly exacerbated by the respondent's repeated misrepresentations. The injuries to the public and the legal profession were also serious, because, as we have observed, public confidence in the legal profession is significantly harmed whenever a lawyer is dishonest. See Grew's Case, 156 N.H. at 365-66; Bosse's Case, 155 N.H. at 132. The respondent also caused injury to the profession when he baselessly accused DeCarolis and the court of impropriety. It is not surprising that the client testified that her trust in lawyers diminished due to her experience.

Having found that the respondent violated duties to the client, the public, the legal system, and the legal profession, that the respondent acted at least knowingly, and, at times, intentionally, and that the respondent caused serious injury, we now determine the applicable baseline sanction. See Salomon's Case, 171 N.H. at 707. We agree with the PCC that the baseline sanction is disbarment. See Standards, supra § 4.41, at 178; § 4.61, at 199; § 7.1, at 341.

Standards § 4.41(c) provides that disbarment is generally appropriate when "a lawyer engages in a pattern of neglect with respect to client matters and causes serious or potentially serious injury to a client." Standards, supra § 4.41(c), at 178. The respondent engaged in a pattern of neglect in this case for nearly a year, which led his client to suffer serious and avoidable harm. Notably, § 4.41(c) does not require any ill motive by the lawyer, and would therefore apply even if the respondent acted with entirely unselfish intentions, as he argues he did.

Standards § 4.61, on the other hand, does require a selfish motive; it provides that disbarment is generally appropriate "when a lawyer knowingly deceives a client with the intent to benefit the lawyer or another, and causes serious injury or potentially serious injury to a client." Standards, supra § 4.61, at 199. The respondent argues that § 4.61 does not apply because he did not lie to his client with the intent to benefit himself or another. The PCC rejected this argument, and we find that the PCC's finding of a selfish motive is supported by the record. As noted by the PCC, in addition to lying to his client, the respondent billed the client for services he did not perform, and pressured her to pay unreasonable fees. Indeed, in his October 13 e-mail to the client, the respondent stated that it would "help me out a lot" if she could make a payment toward her balance with the firm, of which the respondent's father was a partner. Finally, the respondent lied to give his client the false impression that he was working hard for her. Thus, we uphold the PCC's finding that the respondent deceived his client with the intent to benefit himself or another, and that § 4.61 therefore applies.

Section 7.1 also requires a selfish motive. It provides that disbarment is generally appropriate "when a lawyer knowingly engages in conduct that is a

violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system."  Standards, supra § 7.1, at 341.  Here, § 7.1 applies for the same reasons as § 4.61.

"When there are multiple misconduct charges, the sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct among a number of violations; it might well be and generally should be greater than the sanction for the most serious misconduct."  O'Meara's Case, 164 N.H. at 179-80 (quotation omitted).  Here, given that disbarment is the baseline sanction under multiple sections of the Standards, we find that the overall baseline sanction is disbarment.

To determine the ultimate sanction, we consider aggravating and mitigating factors.  See Salomon's Case, 171 N.H. at 706; Standards, supra § 3.0, cmt. at 128.  The PCC found two aggravating factors: the respondent acted with a selfish motive, and engaged in a pattern of misconduct.  See Standards, supra § 9.22, at 418.  The respondent counters that no aggravating factors are present.  We agree with the PCC that the two factors are present.

Here, the respondent acted with a selfish motive because he pressured his client to pay unreasonable fees while lying to his client in order to maintain the false impression that he was working hard on her behalf.  As to the second aggravating factor, we find that the respondent engaged in a pattern of misconduct, making dozens of intentional misrepresentations to his client over a period of many months.

The respondent, citing Morse's Case, 160 N.H. 538, 549 (2010), and Welts' Case, 136 N.H. 588, 593 (1993), argues that this court has never found a "pattern of misconduct" based on a "single course of conduct, even a lengthy one."  However, we do not find these cases to be availing for the respondent.  Welts' Case is inapposite because it involved only a single misrepresentation to the client.  See Welts' Case, 136 N.H. at 590.  Here, in contrast, the respondent lied to his client on a regular basis for a period of months, and admitted to much of his dishonesty only after the ADO began its investigation.  In addition, in Morse's Case we summarily affirmed the PCC's finding that six aggravating factors applied, and ordered the attorney disbarred.  See Morse's Case, 160 N.H. at 549.  Although a pattern of misconduct was not included among the identified aggravating factors, we did not engage in any substantive analysis regarding this factor.  See id.  Neither of the cases cited by the respondent suggests that we cannot find a pattern of misconduct when an attorney lies to the same client on a near-daily basis for a period of months.  Thus, we agree with the PCC that a selfish motive and a pattern of misconduct are aggravating factors.

14

The PCC also identified three mitigating factors: absence of a prior disciplinary record, cooperation with the ADO's investigation, and personal problems. See Standards, supra § 9.32, at 448. We agree with the PCC that the three mitigating factors identified above are present. In addition, after reviewing several letters from former clients and colleagues submitted by the respondent attesting to his character — which support the notion that the respondent's conduct in this case is anomalous in the context of his career — we find that the respondent's character and reputation is also a mitigating factor.

The respondent argues that, other than "remoteness of prior offenses," every mitigating factor is present. We are not persuaded. We agree with the PCC that the respondent did not make a timely good faith effort to make restitution or to rectify the consequences of his misconduct; the respondent was not inexperienced in the practice of law; there was not a material delay in disciplinary proceedings, and no other penalties were imposed. Further since we have found that the respondent acted with a selfish motive, the absence of a dishonest or selfish motive cannot be a mitigating factor.

In addition, we disagree with the respondent that the mitigating factors of physical and mental disability are present. The PCC identified the respondent's sleep apnea as a mitigating factor, though only as a personal problem, rather than as a physical or mental disability. Whether the respondent's sleep apnea qualifies as a disability is material, because an attorney's medical condition is generally entitled to greater weight as a mitigating factor when that condition can properly be characterized as a disability, rather than a personal problem. See In re Thompson, 911 A.2d 373, 377 (Del. 2006); see also Standards, supra § 9.32, cmt. at 457-58. When a mental health condition contributes to an attorney's misconduct, that condition can properly be characterized as a personal problem, rather than as a disability. See Coddington's Case, 155 N.H. 66, 71-72 (2007) (finding attorney's depression to be a personal or emotional problem, rather than a disability).

The respondent argues that the hearing panel erroneously found the respondent's sleep apnea to be mild, rather than severe, and that, by adopting this finding, the PCC did not give adequate weight to the respondent's sleep apnea as a mitigating factor. We disagree. The hearing panel carefully considered the extensive medical evidence in the record, including the results of two sleep studies conducted on the respondent. The panel noted that the respondent's expert witness opined that those studies suggested that the respondent was suffering from mild sleep apnea during his representation of the client. The hearing panel found that the respondent was likely suffering from sleep apnea during the representation, and that this condition "may have adversely affected some of Mr. Mesmer's functioning." The PCC considered

15

these findings, and determined that, although the respondent's sleep apnea is mitigating as a personal problem, his sleep apnea did not rise to the level of a disability.

Here, we agree with the PCC that the respondent's sleep apnea is a personal problem, rather than a disability, because sleep apnea did not cause the respondent's most serious misconduct: his dishonesty to his client and the court. See Sheridan's Case, 148 N.H. 595, 601 (2002) (assuming without deciding that attorney suffered from a health condition, but declining to find that condition mitigating because the condition "did not account for much of the misconduct underlying the ethical violations"); In re Lopes, 770 A.2d 561, 568-69 (D.C. 2001) (attorney's mental health condition was mitigating as to neglect, but not dishonesty, where the condition did not cause the dishonesty); In re Peasley, 90 P.3d 764, 772, 777 (Ariz. 2004) (attorney's "vision problems, pain on his left side, periodic vertigo, and . . . difficulty focusing and concentrating" not mitigating as to dishonesty toward tribunal because attorney "did not establish a causal relationship between his physical problems and his misconduct"); Standards, supra § 9.32, cmt. at 474 ("Courts often point out that health conditions generally are not mitigating factors in reducing a sanction for misconduct, particularly when no causal connection exists between a disorder and the misconduct . . . ."). As noted above, the respondent admitted that many of his misrepresentations to his client were intentional. Further, the respondent's own expert, Dr. Neal, was unable to opine that sleep apnea caused the respondent to make the misrepresentations to the court.

We note that, although the respondent's sleep apnea does not qualify as a disability, his medical history and subsequent treatment are material factors in our analysis. Shortly after the events at issue in this matter, the respondent voluntarily ceased the practice of law, and sought treatment for his health problems. Beginning in 2012, the respondent went to dozens of medical appointments for problems including fatigue, swelling, and abdominal pain. Although he was diagnosed with a number of conditions, the respondent's health did not markedly improve until after he was diagnosed with sleep apnea in 2017. Following this diagnosis, the respondent began sleeping with a CPAP (Continuous Positive Airway Pressure) machine, and has been healthier with less fatigue. After a period of approximately 15 months not practicing law, in March 2018, the respondent returned to practice handling a full caseload, apparently without additional instances of misconduct. Thus, we take into account the respondent's struggles with his health during the events at issue in this matter, as well as his representations that he has since addressed his health problems, and is once again capable of handling the serious responsibilities associated with the practice of law.

The PCC ultimately determined that it would be appropriate to "depart[] down" from the baseline sanction of disbarment to a three-year suspension,

16

with 18 months stayed, provided that the respondent pays for the costs of investigating and prosecuting this matter, and engages in no further professional misconduct. The PCC stated that this sanction "afford[s] weight to the mitigating factors – including Mr. Mesmer's condition," and that "[t]he additional stayed suspension will . . . provide protection to the public, and deter Mr. Mesmer from committing future misconduct."

The respondent argues that the PCC's recommended sanction is unnecessarily severe, and that he should instead receive a fully-stayed suspension. He contends that the recommended sanction does not reflect the significance of his sleep apnea as a mitigating factor. He also argues that the recommended sanction is disproportionate when compared to the sanctions in other attorney discipline cases, and that it would merely inflict punishment, rather than serving the non-punitive purposes of attorney discipline. We disagree.

We agree with the PCC that the mitigating factors here warrant a downward departure from the baseline sanction of disbarment. The sanction of a three-year suspension, with 18 months stayed, is consistent with our prior cases in which attorneys with no prior disciplinary history have been suspended for misconduct involving dishonesty. See, e.g., Grew's Case, 156 N.H. 361, 367, 369 (2007) (two-year suspension); Feld's Case, 149 N.H. 19, 30 (2002) (one-year suspension); Bruzga's Case, 145 N.H. 62, 72 (2000) (one-year suspension). The sanction of three years is appropriate because the respondent's misconduct involved dishonesty to both his client and the court, as well as several other ethical violations.

In addition, the sanction takes the respondent's sleep apnea into account, and comports with the non-punitive purposes of attorney discipline. The sanction gives weight to the respondent's medical history and his representations that he has addressed his health problems, learned from his mistakes, and is again a fully-functioning attorney. However, the fully-stayed suspension the respondent argues for would be inappropriate, as this court has a duty to inform the public and the bar that misconduct involving intentional dishonesty to clients and the court will be met with a significant sanction. See Wolterbeek's Case, 152 N.H. 710, 717 (2005). We agree with the PCC that the respondent must serve a suspension that will require him to petition for reinstatement, and receive an order from this court, before he is permitted to return to practice. See Sup. Ct. R. 37(14)(b).

For the foregoing reasons, we order the respondent suspended for three years, and we order him to pay all costs associated with the investigation and prosecution of this matter. See Sup. Ct. R. 37(19). We further order that 18 months of the suspension shall be stayed, provided that the respondent pays said expenses and engages in no further professional misconduct.

So ordered.

HANTZ MARCONI and DONOVAN, JJ., concurred.